**ROBERT HAWTHORNE, INC.**

v.

**DIRECTOR OF INTERNAL REVENUE**
and United States Department of Justice, Eastern District of Pennsylvania.
Civ. A. No. 74–2874.

United States District Court,
E. D. Pennsylvania.

Nov. 11, 1975,

As amended March 3, 1976.

Wilbur Greenberg, Philadelphia, Pa., for plaintiff.

J. Clayton Undercofler, 1st Asst. U. S. Atty., Robert E. Curran, U. S. Atty., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This case concerns allegations of governmental bad faith in connection with a federal grand jury investigation, alleged breach of the secrecy of the grand jury, and allegedly unlawful retention by the grand jury of certain records of the plaintiff. The investigation in question relates to possible violations of federal statutes in connection with the award of contracts by the City of Philadelphia and related governmental authorities.[1] Plaintiff, a demolition contractor, originally came under scrutiny because it was one of many firms which had done business with those entities. It has now become a target of the in-

---

1. The government indicates that potential violations of the following criminal statutes are under consideration by the grand jury: 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. §§ 1951 and 1952 (the Hobbs Act) and 26 U.S.C. §§ 7201, 7203, and 7206(1) (income tax violations). The related governmental authorities include the Philadelphia Redevelopment Authority and the Philadelphia Housing Authority.

vestigation, both as to its contracting activities and as to possible federal income tax violations. In the proceedings before us plaintiff seeks injunctive relief against the continuation of the investigation, at least as to plaintiff. Alternatively, plaintiff seeks to restrain the alleged breach of the secrecy of the grand jury involved in the disclosure of certain subpoenaed material to the Internal Revenue Service (I.R.S.), pursuant to order of this court, and to recover a large number of its corporate records which have been the subject of omnibus subpoenas and which now repose in the offices of the I.R.S., though under the aegis of the United States Attorney.

The allegations of plaintiff's complaint are manifold. However, distilled to their essence they raise three significant points: 1) that the manner in which the Justice Department has conducted the investigation constitutes an abuse of the grand jury process;[2] 2) that the secrecy of the grand jury, protected by Rule 6(e) of the Federal Rules

of Criminal Procedure, has been breached by improper issuance or violation of judicial orders entered pursuant to that rule, granting access to plaintiff's subpoenaed records to I.R.S. agents assisting the U.S. Attorney in the investigation;[3] and 3) that records belonging to the plaintiff have been improperly retained by the government. The government emphatically denies that it has acted in bad faith, abused the grand jury process, violated Rule 6(e) orders, or improperly refused to return plaintiff's records.

■■ When the parties first came before us the plaintiff sought far more limited relief: a return of its records and an order restraining government agents from interviewing those with whom plaintiff had business dealings. When it appeared, after several conferences, that the matter could not be adjusted amicably, we stated that we would dispose of it on affidavits. In due course, the complaint was amended to allege much broader grounds for relief.[4] However, even after the amend-

2. The allegations of abuse of the grand jury process include the following: 1) that government agents have made misrepresentations in order to obtain plaintiff's records; 2) that the grand jury investigation was either a subterfuge for carrying on a previous I.R.S. investigation or a cover to obtain records for civil tax purposes; 3) that government agents improperly interviewed third party witnesses (customers of plaintiff); 4) that the expiration of different grand juries to which matters had been submitted makes submissions to later grand juries improper; 5) that the government retained and inspected records without submitting them to the grand jury; 6) that the omnibus subpoenas were overbroad and oppressive; 7) that no probable cause showing was made to justify the subpoenas; 8) that the government has acted in bad faith; and 9) that the extent to which the prosecutor controls the grand jury process in this court (and concededly in every other court in the land) itself amounts to abuse.

3. The allegations of Rule 6(e) violations include the following: 1) I.R.S. employees were not sworn to secrecy or given adequate advice as to the I.R.S.'s limited access to grand jury material, i. e., that it must remain under the aegis of the U. S. Attorney; 2) the plaintiff's records were, pursuant to direction

or subpoenas, delivered directly to the offices of I.R.S. and not to the U. S. Attorney or the grand jury room; 3) I.R.S. retained the records in its possession; 4) the U. S. Attorney did not directly supervise the activities of the I.R.S. agents or know the name of all the I.R.S. agents working on the case; 5) the U. S. Attorney could have hired persons on a contract basis to assist it instead of utilizing I.R.S.; and 6) an I.R.S. agent working on the case refused to consult with plaintiff's counsel because he had not filed a power of attorney in accordance with I.R.S. regulations.

4. The amended complaint alleged federal question (28 U.S.C. § 1331) and mandamus (28 U.S.C. § 1361) jurisdiction. After the filing of the amended complaint, the government moved to dismiss on the grounds that we lacked jurisdiction over the subject matter of the action and that the complaint did not state a claim upon which relief could be granted. We denied the motion to dismiss.

Historically, the grand jury is an arm of the Court. The district court has the power to call a grand jury into existence; 18 U.S.C. § 3331; Fed.R.Crim.P. 6(a). Under Fed.R. Crim.P. 17(a) and 28 U.S.C § 1826(a) respectively, the district court is given the power to issue and the duty to enforce grand

**1104**

ments, we believed that the matter could be disposed of on affidavits; hence, we requested from the government and received a considerable number of additional affidavits covering every aspect of plaintiff's allegations.[5] When it appeared that there were still certain disputed issues of fact, we augmented the record by taking testimony at a final hearing.

As will be seen, we feel discomfiture over the prolongation of this grand jury investigation, and much dissatisfaction with the government's procedures for keeping records in connection with grand jury investigations, and have some suggestions to make in those regards. However, because we find no actionable abuse of the grand jury process and no ultimate impropriety in retention of certain records under the circumstances we deny relief on those claims. Neither do we find that the government has breached the secrecy of the grand jury

jury subpoenas. It is settled (see discussion *infra*) that the district court has supervisory power over the grand jury and that a broad range of devices is available to a district court in resolving challenges to the propriety of grand jury process, including consideration of affidavits. See *In re Grand Jury Proceedings*, 507 F.2d 963 (3d Cir. 1975) (hereinafter *Schofield II*). Although much of plaintiff's attack here is upon the subpoenas issued to it and the manner of use and retention of the subpoenaed material, matters which could be raised on a garden variety motion to quash or for a protective order, other relief sought is far broader; *i. e.*, termination of the grand jury proceeding itself. In our view, the quest for broader relief does not deprive the court of jurisdiction. We agree with our late colleague Judge Body who, in *Levinson v. Attorney General*, 321 F.Supp. 984 (E.D.Pa.1970), denied an identical government motion directed to a complaint seeking a restraining order against a grand jury investigation. Judge Body wrote:

We are not persuaded by the procedural objections raised by the defendants. Our research indicates that a variety of remedies are customarily employed to achieve the end plaintiffs now seek. A motion to quash is probably the means most frequently used. Nevertheless, there are instances in which a petition to vacate and restrain, applications to quash, stay and restrain, and a motion for a protective order have also been utilized. For this reason we reject the

or violated a Federal Criminal Rule 6(e) order. However, because we are concerned as to the manner in which the Rule 6(e) orders were implemented in this case and apparently in general, we also offer some suggestions in that area. We feel further judicial explication on this point by us is not inappropriate in view of the fact that the sole authority cited by the parties as the frame of reference for determining compliance with a Rule 6(e) order is our own opinion in the case of *In re Grand Jury Investigation William H. Pflaumer & Sons, Inc.*, 53 F.R.D. 464 (E.D.Pa.1971) (hereinafter *Pflaumer*).

Before discussion of these substantive issues, we must first set forth our findings of fact, which are based upon the affidavits submitted by the parties and upon the testimony offered at hearing. Because of the broad based attack made by the plaintiffs on the manner in which grand jury proceedings are conducted,

formal objection that plaintiffs have mistakenly invoked the equitable as opposed to the legal, jurisdiction of the Court. *We think the instant suit is more properly viewed as one in which this Court is asked to exercise its supervisory power over a grand jury sitting herein to prevent the process of that grand jury from being used abusively.* Moreover, plaintiffs have previously attmepted to raise these same issues by means of a motion to quash and were ultimately remitted to this Court by the Court of Appeals with the suggestion that they do so through a formal request for an injunction. We therefore conclude that the form of action chosen is proper.

321 F.Supp. at 986 (emphasis added; footnotes omitted). See also *In re Grand Jury Investigation (General Motors Corp.)*, 32 F. R.D. 175, 181 (S.D.N.Y.), *app. dismissed*, 318 F.2d 533 (2d Cir.), *cert. denied*, 375 U.S. 802, 84 S.Ct. 25, 11 L.Ed.2d 37 (1963) (motion for injunction or protective order, while not appealable because equivalent to motion to quash, is within district court's supervisory jurisdiction).

5. Two of the affidavits were received *in camera*. The first was offered as a showing that there existed a factual basis for continuation of the grand jury investigation and the second as a showing of government's need to retain certain original records of plaintiff, as opposed to copies.

we first make findings on that general subject. We then set forth our findings on the specifics of the Hawthorne investigation, implementation of the 6(e) orders and the retention of records, after which we discuss the applicable law.

## II. *Findings of Fact*

A. *Investigative Grand Jury Procedures in General; Procedures Followed in Connection with Federal Criminal Rule 6(e) Orders*

An affidavit filed by the United States Attorney for the Eastern District of Pennsylvania sets forth in great detail the procedures followed in this District in the conduct of a grand jury investigation. The affidavit also recites the procedures followed in connection with orders issued under Fed.R.Crim.P. 6(e). The affidavit is uncontroverted, and our findings based thereon now follow.

Grand juries are summoned by the Court. Thereafter, they meet on a weekly basis on the same day of each week.[6] The scheduling of matters coming before the different grand juries (there are presently four sitting grand juries) is centrally coordinated by two Assistant United States Attorneys working in conjunction with the Clerk's office. Matters are selected for grand jury attention by varying methods. Suggestions for grand jury investigation may originate from the United States Attorney's office, from the grand jury, from a par-

ticular investigating agency, or from the public. Ultimately, the decision on what comes before a grand jury is made by the United States Attorney's office or by the grand jury, with the caveat that the grand jury always has the ultimate right to refuse to hear anything brought before it by the United States Attorney's office acting on its own.[7]

Every matter that is determined appropriate for grand jury investigation, if not already being considered by an investigating agency, is referred to the federal investigating agency statutorily designated with the enforcement of the suspected offenses. Thereafter, the grand jury investigation proceeds in conjunction with the efforts of that particular agency. The investigating agency performs such necessary functions as exploring leads and allegations and interviewing witnesses outside the grand jury, gathering and reviewing documentary evidence, and writing investigatory reports. A complete field investigation by the appropriate federal agency is usually required so that the grand jury's investigation may be as thorough and expeditious as possible.

Grand jury subpoenas requiring the appearance of witnesses or the production of records are prepared by the United States Attorney's office. The determination of who or what will be subpoenaed is made either by the United States Attorney's office or the grand jury, or through a combination of the two in discussion.[8] Subpoenas, however,

---

6. This practice is subject to modification in certain situations, such as protracted investigations or emergencies.

7. Interestingly, at common law, "the freedom of the jurors from prosecutorial control was well-fortified. The prosecutor had no right to enter the jury room. . . . The grand jurors examined the witnesses themselves. . . . 'It is even doubtful whether [the prosecutor] had a right, unsolicited, to send indictments to the inquisitorial body for consideration.' *United States v. Wells*, 163 F. 313, 324 (D.Idaho 1908)." Note, *Administrative Agency Access to Grand Jury Materials*, 75 Col.L.Rev. 162, 180 n. 160 (1975). See also *United States v. Kleen Laundry & Clean-*

*ers, Inc.*, 381 F.Supp. 519, 521 (E.D.N.Y. 1974) (Weinstein, J.).

8. Grand jury subpoenas are served in the following ways: (1) by the United States Marshal; (2) by the participating investigating agency; or (3) by the United States Attorney's office through agreement with the parties, or their counsel. Following the service of subpoenas, contacts with witnesses and records custodians are supervised and ultimately conducted by the United States Attorney's office. In situations where witnesses or records custodians contact the serving party or the investigating agent, the calls or inquiries are forwarded to the United States Attorney's office. In the course of these con-

are not the exclusive means for the production of evidence, documents or testimony in connection with a grand jury investigation. Frequently, relevant parties and their counsel voluntarily produce evidence or documents without the necessity of subpoena.

The United States Attorney's office and the grand jury have accepted compliance with subpoenae duces tecum for the production of records in a variety of ways. Normally, the party furnishing records produces the records at the grand jury room and that party is requested to testify concerning delivery of the records specified in the subpoena but not furnished. Dependent upon the circumstances of the particular matter, however, the nature of the records subpoenaed, the volume of such records and the necessities and operations of the subpoenaed party, the United States Attorney's office may agree with subpoenaed parties and their counsel that compliance with the subpoena be satisfied in some other manner.[9] Often, where documents are voluminous, the United States Attorney's office agrees to accept compliance with

the subpoena by the furnishing of the records in accordance with a mutually agreeable schedule. Voluminous records are rarely brought inside the grand jury room; rather, they are delivered to the vicinity of the grand jury room or are supplied as set forth in footnote 9.[10]

It appears that documents initially received pursuant to subpoenae duces tecum are not generally of substantial probative value per se. Such documents and records must be received, analyzed, compared, studied and understood before they meet the investigative or evidentiary demand for which they were subpoenaed and before meaningful presentation of the contents of such records can be made to the grand jury. Because of the need to accomplish the maximum effective use of the grand jury's time, the United States Attorney's office does not review and analyze subpoenaed records in the grand jury room or in the presence of the grand jury. For the most part, analysis and examination of subpoenaed records is performed neither by the Assistant United States Attorney assigned to the investigation nor by members of the United States Attor-

---

tacts, the United States Attorney's office may grant continuances of the scheduled dates of appearance or production of documents or enter into agreements with witnesses, custodians or their counsel relating to the amendment of subpoenas or the nature of compliance.

9. As an accommodation to subpoenaed parties, the United States Attorney's office sometimes accepts compliance by delivery to the vicinity of the grand jury room or by delivery to the offices of the United States Attorney or the participating investigating agency. In situations where the documents are few, compliance is sometimes accepted by the transmission of the materials by mail to the United States Attorney's office or the participating investigating agency. In situations where the documents are voluminous, and where the subpoenaed party requests it, compliance is accepted by the furnishing of the documents directly to the investigating agent on the premises of the subpoenaed party. Where the subpoenaed documents are both voluminous and vital for' the daily operations of the subpoenaed party and where the party requests it, compliance is accepted, in some limited

instances, by an agreement allowing the investigating agents to conduct a preliminary review of the subpoenaed material on the subpoenaed party's premises and by the subsequent delivery to the grand jury, United States Attorney's office or participating investigating agency of a more limited set of documents or of copies of critical documents.

10. Parties producing records pursuant to subpoena are normally requested to prepare a list of the records furnished so that a receipt may be given. Where there is no such prepared list and where requested, receipts are prepared and given by the United States Attorney's office or the investigating agent. Decisions as to the initiation of contempt proceedings for the failure to comply with subpoenas, for the refusal to provide requested items, such as, handwriting and voice exemplars and the refusal to testify are made either by the United States Attorney's office or by the grand jury after discussion with the United States Attorney's office. Where such enforcement measures are undertaken, the United States Attorney's office advises the grand jury of the status of the proceedings.

ney's office.[11] Agents of the participating investigating agency perform this function because of their resources, experience and expertise. This function is delegated by authority of the first sentence of Fed.R.Crim.P. 6(e) which authorizes disclosure of matters occurring before the grand jury to the attorneys for the government for use in the performance of their duties (see extended discussion, *infra*).[12] This review of subpoenaed material by the investigating agency is in accordance with the other functions performed by the agency in conjunction with the grand jury investigation. The findings of the investigating agency are submitted to the United States Attorney's office which then schedules matters to appear before the grand jury.

Documents obtained by the grand jury and provided to an investigative agency are maintained by the agency in liaison with the United States Attorney's office. Each matter appropriate for grand jury investigation has a particular Assistant United States Attorney assigned to it, who makes the initial decisions regarding the investigation, the summoning of witnesses and the securing of records through grand jury subpoena. The agency furnished with the subpoenaed records reports to the particular Assistant United States Attorney and, where grand jury matters or materials are concerned, takes direction from that Assistant. Thus, the Assistant United States Attorney assigned to each matter

controls the delivery, maintenance, use and return of all subpoenaed materials.[13]

In due course the grand jury considers the evidence brought before it and determines whether to return an indictment. In this respect too (though this is not the subject of an affidavit), the jury is obviously influenced by the United States Attorney.

### B. The Hawthorne Investigation

1. *History of the Investigation; Did the Government Act in Bad Faith?*

In September, 1971, the Organized Crime and Racketeering Section of the United States Department of Justice, Philadelphia Strike Force, commenced an investigation before a federal grand jury into possible federal criminal violations in connection with the award of municipal contracts in the City of Philadelphia. On October 4, 1971, we entered, *ex parte*, an Order pursuant to Federal Rule of Criminal Procedure 6(e), captioned *In re Grand Jury Investigation Purchases and Contracts—City of Philadelphia*, Miscellaneous Number 71–295, which authorized the Justice Department to utilize the assistance of I.R.S. agents in connection with the investigation and which gave the I.R.S. agents access to books, records, documents, and transcripts before the grand jury. This order provided that the I.R.S. agents were not prohibited from also utilizing the material in the course of their official duties

---

11. The United States Attorney's office does not presently employ investigators, accountants, auditors or persons trained in the examination and analysis of banking, corporate, business or financial records. The attorneys on the staff of the United States Attorney's office do not generally have the time, training or expertise necessary to conduct detailed and technical document examinations for investigatory purposes.

12. In all cases involving the Internal Revenue Service, as the result of direct request from I.R.S., formal Rule 6(e) Orders are petitioned for and obtained prior to disclosure of record or testimony obtained through the grand jury process.

13. In order to preserve the secrecy of the grand jury, each particular investigating agent and agency furnished with grand jury materials is advised of the limited disclosure provisions relating to this information and is responsible for the custody and safekeeping of such materials in a manner consistent with these provisions. The precise manner in which grand jury materials are maintained varies with each agency. With respect to I.R.S., documents are maintained in a certain room in the Federal Building. Access to these documents is limited to persons working directly on the criminal investigation presently before the grand jury We comment further upon the I.R.S. 6(e) procedures and their efficacy in Parts II. B.2. and III. C. *infra.*

provided that the subpoenaed material remained at all times "under the aegis of attorneys for the government."

On August 15, 1973, in connection with the same investigation, the Strike Force authorized the issuance of a grand jury subpoena duces tecum calling for the production of various corporate records of plaintiff Robert Hawthorne, Inc., for the years 1969, 1970, 1971, and 1972. There records were not subpoenaed to the original grand jury but rather to a grand jury which had been empanelled on July 11, 1973, by our colleague, Judge Van Artsdalen. Plaintiff contends that prior to the time of the subpoena for plaintiff's records, the I.R.S. was conducting its own official criminal investigation of plaintiff and that I.R.S. had requested and was given access to material obtained by the grand jury for assistance in its own investigation. There is no credible evidence to support this contention, and we find to the contrary; *i. e.*, that I.R.S. was not conducting and did not conduct its own investigation, separate from the grand jury investigation.

In directions accompanying the August 15, 1973 subpoena, the plaintiff was instructed to deliver the records to the I.R.S. office, to prepare a receipt for all items being delivered, and to have a custodian of the records appear before the grand jury at the time and place specified in the subpoena. At the time, the government was acting under our 6(e) order of October 24, 1971. On August 29, 1973, in response to the grand jury subpoena dated August 15, 1973, which had been narrowed in scope by agreement of plaintiff's counsel and the Strike Force attorney to specify only plaintiff's 1972 corporate records, plaintiff produced a portion of the 1972 records and failed to produce others. The financial records missing were purchase invoices, bad debt support, petty cash invoices, and accounts receivable and accounts payable ledger cards. All records produced by the plaintiff were furnished to those employees of the I.R.S. designated to assist the grand jury and the Philadelphia Strike Force in the investigative project. The documents produced in response to the subpoena were reached for consideration on September 19, 1973, by Internal Revenue Agent Gary Robin. The records were extremely voluminous, consisting of approximately 17,000 documents.

In September and October 1973, Agent Robin arranged the corporate checks, inspected them and reviewed the other financial records furnished, with a view to identifying evidence of or leads bearing upon possible criminal violations. Due to the absence of subpoenaed records, Agent Robin could not complete the investigation at that time. Specifically, he was unable to verify the propriety of petty cash expenditures; he was unable to substantiate bad debt claims; he was unable readily to trace and substantiate the source of expenditures; and he was unable to substantiate the propriety of expenditures. In order to obtain records not furnished pursuant to the subpoena of August 15, 1973, Agent Robin arranged for the Strike Force Attorney assigned to this matter, Thomas A. Bergstrom, to contact plaintiff's counsel, Wilbur Greenberg, Esquire. Agent Robin also contacted Mr. Greenberg on October 3, 9, 15, and 19, 1973. However, the missing documents were still not produced.

On November 20, 1973, in response to an *ex parte* petition of the government, our colleague Judge A. Leon Higginbotham, Jr. entered an order pursuant to Rule 6(e) authorizing the disclosure to agents and employees of the Internal Revenue Service of matters occurring before a grand jury empanelled October 25, 1973, by our colleague Judge John B. Hannum to which the investigation had been turned over. Judge Higginbotham's order contained the same terms as our October 4, 1971 order and, in effect, superseded it.

On February 6, 1974, Special Agent William Pyfer, of the I.R.S. Intelligence Division, was assigned to work on the

investigation, and he assumed the examination of plaintiff's records from Revenue Agent Robin.[14] Agent Pyfer thereupon undertook an extensive examination of plaintiff's records.[15] Because of the absence of some subpoenaed records, complete investigation and verification were not possible in the areas of bad debt claims, petty cash expenditures, billing expenditures, accounts payable and accounts receivable. In an effort to continue the review in these foregoing areas despite the absence of the records, Agent Pyfer initiated third party contacts. Companies and individuals were contacted and interviewed to verify certain expenditures, to confirm the existence of persons named on the payrolls and to corroborate bad debt claims. All of the above verification and audit techniques were performed from February, 1974, through May, 1974.

In April, 1974, the investigation into possible criminal violations with respect to the award of municipal contracts in the City of Philadelphia (which had been known as the "Philadelphia Project") was taken over from the Strike Force by the United States Attorney's office for the Eastern District of Pennsylvania. Since then the grand jury investigation has been conducted by the staff of that office. On May 1, 1974, First Assistant United States Attorney J. Clayton Undercofler, III, authorized the issuance of a grand jury subpoena calling for the production of plaintiff's records for 1971 and 1972 and subsidiary cash receipt books for 1970, 1971 and 1972.[16] On May 30, 1974, plaintiff produced 1971 records and a copy of its 1970 Federal Employers Tax Return. Plaintiff did not produce the 1971 and 1972 purchase invoices, petty cash invoices, bad debt support, accounts payable and receivable ledger cards and the 1970 subsidiary cash receipts book. The records received on May 30, 1974, were reached for consideration by Special Agent Pyfer on May 31, 1974. Special Agent Pyfer also utilized the resources of other I.R.S. personnel in the furtherance of the investigation. Special Agent Pyfer and others reviewed the material, performing various verification and audit techniques.[17] In conjunction with analysis of records, the number of third party contacts and interviews was increased after May 31, 1974. Banks, companies and individuals were contacted in an effort to verify the material furnished and to establish information not furnished by the missing

14. On February 13 and 20, 1974, Special Agent Pyfer contacted Mr. Greenberg in an attempt to secure the subpoenaed records that had not been produced, but he was also unsuccessful.

15. *Inter alia*, Agent Pyfer did the following: He examined each check drawn on the corporation's regular checking account. He compared all checks with check stubs, and he verified all checks with the bank statements. He examined the corporate bank deposits, analyzed various ledgers and reviewed the sales invoices. He examined payroll records and compared them with the payroll checks. He reviewed the plaintiff's contracts and examined its tax returns in detail.

16. The subpoena called for the production of records before the grand jury that had been empanelled on October 25, 1973, by Judge Hannum.

17. These included:
 (1) verification of accounts receivable;
 (2) examination of petty cash records;
 (3) examination of the accounts receivable records;
 (4) examination of the accounts payable records;
 (5) examination of the sales journals, cash receipts ledger, purchase journals, cash disbursements journal, general journals and the general ledgers;
 (6) review and examination of the sales invoices;
 (7) examination and inspection of all cancelled checks;
 (8) review of all contracts;
 (9) examination of the check stub registers and comparisons with cancelled checks;
 (10) tracing certain cancelled checks through available corporate records;
 (11) review of bank statements and comparison with cancelled checks; and
 (12) review and examination of bad debt claims and available supporting documentation.

records.[18] Third party contacts of this nature continued through December, 1974.

On May 30, 1974, following a preliminary review of the records produced, Special Agent Pyfer contacted June Hyduk, Secretary of plaintiff, in an attempt to obtain various records specified in the subpoena of May 1, 1974, that had not been produced. On June 4, 1974, in further response to the subpoena of May 1, 1974, plaintiff produced certain additional records,[19] but omitted others.[20] The additional records received on June 4, 1974, were reached for consideration by Special Agent Pyfer on June 5, 1974. On June 6, 1974, we entered another Rule 6(e) order in the same terms as those entered previously. On July 31, 1974, Assistant United States Attorney John F. Penrose authorized the issuance of a grand jury subpoena duces tecum calling for the production on August 15, 1974 of still more records,[21] but these were not produced. Then, on August 26, 1974, Mr. Penrose authorized the issuance of a grand jury subpoena duces tecum calling for the production of certain of the plaintiff's corporate records for the years 1970 through 1973 inclusive. On September 5, 1974, following service of that grand jury subpoena, all records were produced including some of those previously omitted and including those called for in the July 31, 1974 subpoena.

The records received on September 5, 1974, were reached for consideration by Special Agent Pyfer on September 14, 1974. Again, all the records were examined,[22] and field investigation via third party contacts in connection with the review of the records was continued. The examination of plaintiff's records consumed approximately three months from September 5 to December 13, 1974. Prior to September 5, 1974, the absence of critical subpoenaed records had prevented a prompt and thorough criminal investigatory review. The failure to produce any billing invoices until that date made it impossible to examine the supporting documentation for the vast majority of all expenditures. Further, the absence of these records prevented their presentation to any third parties for verification.

On October 18, 1974, and on October 22, 1974, Special Agent Pyfer mistakenly issued Internal Revenue Service summonses to certain third parties calling

18. The field investigation was directed to the following matters:
 (1) verification of parties named ·on payroll records;
 (2) substantiation of bad debt claims;
 (3) verification of expenditures for petty cash expenditures;
 (4) determination of processing systems regarding plaintiff's checks and records;
 (5) tracing disposition and purpose of various cancelled checks;
 (6) determination of the supporting data for general invoiced expenditures;
 (7) presentation of questionable material for purposes of verification; and
 (8) consultations with bank officials.

19. Produced were 1972 originals and copies of accounts receivable ledger cards, 1972 originals and copies of accounts payable ledger cards, 1972 bad debt files (copies), and 1972 petty cash files.

20. Omitted were some 1971 accounts receivable and payable ledger cards, 1971 bad debt support, 1971 and 1972 purchase invoices and the 1970 subsidiary cash receipts book.

21. This third subpoena called for:
 (1) all cancelled checks written during the month of January, 1973;
 (2) all check stub books on which checks were written in the month of January, 1973;
 (3) all accounts receivable and accounts payable ledger cards for the year 1971;
 (4) all purchase invoices for the years 1971 and 1972; and
 (5) all sales invoices for the years 1971 and 1972.

22. Special Agent Pyfer examined the purchase journals, the cash disbursements journals, the general journals and the general ledgers. Payroll records were reviewed, billing invoices were analyzed, and corporate bank loan records were examined. All 1970 and 1973 checks drawn on the regular checking account were inspected and listed on schedules. Specific checks and entries on the books were traced through the available records.

for the production of records at the I.R.S. offices. Prior to issuance of these summonses Agent Pyfer did not consult with his I.R.S. superiors or the United States Attorney. Special Agent Pyfer issued the summonses, upon the misconception that they were proper, after certain third parties contacted for information requested an official document prior to the release of information. Upon the discovery by Special Agent Griggs, the investigative project leader, and by the United States Attorney's office of the issuance of the summonses, immediate and thorough corrective action was taken.[23]

On December 13, 1974, the grand jury returned to plaintiff either originals or copies of all records the plaintiff had produced, but numerous original records were retained in furtherance of the investigation (see discussion *infra*), and these have continued to receive consideration by I.R.S. agents. We also find that: (1) the records of plaintiff during their original and continuing consideration have been examined, reviewed and analyzed solely for criminal investigatory purposes, and not for any civil tax purpose for which the grand jury a subterfuge; (2) records of plaintiff obtained pursuant to grand jury subpoena have been disclosed to no agency other than the I.R.S.; (3) the I.R.S. has made no civil tax use of any records or information supplied pursuant to the grand jury process; and (4) no civil tax assessments or collections have been made against plaintiff or its officers as a result of the records produced pursuant to the grand jury subpoenas. .

With reference to plaintiff's documents, there have been two submissions to the grand jury empanelled October 25, 1973:

(a) The first submission occurred on September 5, 1974, and consisted of the testimony of plaintiff's corporate secretary, June Hyduk. Mrs. Hyduk appeared in response to the subpoenas of July 31, 1974, and August 26, 1974. Prior to her appearance, Mrs. Hyduk telephoned the United States Attorney's office and stated that she and another woman had come to the grand jury with a pick-up truck containing approximately twenty boxes of records. Mrs. Hyduk requested help unloading the truck. The Internal Revenue Service was contacted by Assistant United States Attorney Richard R. Galli, and arrangements were made for delivery of the documents to Internal Revenue Service officers. Mrs. ' Hyduk then appeared before the grand jury and testified.

(b) The second submission occurred on November 21, 1974, and consisted of presenting to the grand jury five checks of Robert Hawthorne, Inc., drawn on a certain account at Philadelphia National Bank. At the time these checks were presented, the grand jury also heard third party testimony concerning plaintiff and others.

On February 6, 1975, a new grand jury was empanelled by our colleague Judge James H. Gorbey, and it assumed the investigation of Purchases and Contracts —City of Philadelphia. On February 6, 1975, Special Agent Pyfer appeared before it and testified with reference to the general investigation as it pertains to plaintiff and others related to plaintiff. The investigation is ongoing.[24]

---

23. Records received pursuant to summons were either returned or were withheld from examination; Special Agent Pyfer was advised concerning the improper issuance of the summonses; and grand jury subpoenae were issued to the parties that had received summonses, calling for the production of the records previously requested in the summonses.

24. There appears to be no symmetry or regularity in the manner in which the government has utilized grand juries for given portions of the investigation, nor does it appear that accurate records are kept on the subject. In the original affidavit filed on the point the government suggested that the grand jury which first gave investigative attention to the Hawthorne matter was that empanelled

Having recounted the history of the investigation, we turn to plaintiff's allegations that the grand jury investigation is without justification and constitutes no more than an illegal "fishing expedition." In response to plaintiff's request, we required the government to make a *Schofield* showing,[25] by way of *in camera* affidavit, that the investigation had turned up sufficient evidence of criminal activity by the plaintiff to justify its continuation. Two *in camera* affidavits have been filed (and sealed), one by I.R.S. Special Agent William J. Pyfer and the other by First Assistant United States Attorney J. Clayton Undercofler. These affidavits contain far more than the minimal showing required by *Schofield* and in our judgment justify the continuance of the investigation. (They also add to our finding made independent of the *in camera* affidavits that the government has not acted in bad faith.)

Several other allegations of the plaintiff require findings. First, notwithstanding plaintiff's contentions to the contrary, we find that no attorney of the Department of Justice ever informed an attorney representing plaintiff that plaintiff was not a subject of investigation by the grand jury. Neither do we find that plaintiff delivered materials pursuant to the subpoena of August 15, 1971, in reliance upon any such representations by an attorney employed by the Department of Justice. Although,

as noted above, I.R.S. agents made certain third party contacts in aid of the investigation, we find no evidence that the agents harassed persons or parties dealing with the plaintiff. We likewise find without merit plaintiff's contentions that Assistant United States Attorney John Penrose acted improperly in his discussions with representatives of the plaintiff in the presence of their attorney.

The foregoing findings relate primarily to matters of subsidiary fact. Findings of ultimate fact of course must be based thereon, though they are inevitably affected by our discussion (which follows) of the applicable principles of law. Subject to that discussion, and as further amplified and explained by it, it is appropriate to note at this juncture our ultimate finding that, notwithstanding the fact that the investigation might have proceeded more expiditiously, the government did not act in bad faith or abuse the grand jury process.

### 2. *Compliance With the Rule 6(e) Orders*

Three orders under Fed.R.Crim.P. 6(e) are relevant to this proceeding. We executed the first on October 4, 1971; Judge Higginbotham entered the second on November 20, 1973; and we entered the third on June 6, 1974. All three orders contained the same terms, providing that

by Judge Van Artsdalen on December 7, 1971. That grand jury had been investigating the purchases and contracts of the City of Philadelphia but, as appeared from a later affidavit, ceased to meet after July 11, 1973, although it remained in existence until December of 1974, so as to consider a certain indictment, the presentment of which had been delayed by pre-indictment appellate procedures in connection with certain records which were then under subpoena. The government's subsequent affidavit recanted the previous statement and instead averred that the first grand jury to give investigative attention to the Hawthorne matter was that empanelled by Judge Van Artsdalen on July 11, 1973. The May, July, and August 1974 subpoenas were issued for a return date of Thursday, the date on which a grand jury

empanelled by Judge Hannum on October 25, 1973, had met regularly. That grand jury is no longer sitting and the investigation has been taken over by the grand jury empanelled by Judge Gorbey on February 6, 1975. As the foregoing factual recitation indicates, the fact that records were subpoenaed before a given grand jury does not mean that those matters ultimately were submitted to the grand jury. Indeed, the actual submissions in this case have been few and far between. Presumably, however, when the documents have been fully evaluated by I.R.S. and the United States Attorney's office, a comprehensive submission will be made resulting in an indictment, or else the matter will be dropped.

25. *See* Part III. A. *infra.*

the Justice Department was authorized to utilize the assistance of I.R.S. agents in the grand jury investigation and to give the agents access to books, records, documents, and transcripts of testimony before the grand jury in the investigation. The orders further provide that the agents were not prohibited from utilizing such material in the course of their official duties, for either criminal or civil purposes, provided that the subpoenaed material shall remain at all times under the aegis of attorneys for the government. In findings of fact already made we have set forth in detail when and how various records were produced by plaintiff, and delivered to I.R.S. agents acting pursuant to the 6(e) orders, and when the records were reached for consideration by the agents. We add the following.

As we have noted above, the United States Attorney's office does not employ investigators, accountants, auditors or persons trained in the examination and analysis of banking, corporate, business and financial records, and the attorneys on the staff of the United States Attorney's office do not generally have the time, training or accounting expertise necessary to conduct detailed and technical document examinations for investigatory purposes. The foregoing findings respecting the nature of the documents subpoenaed and the complexity of the analysis required support this conclusion. By way of further example we note that over 12,000 non-payroll checks were inspected and traced through the corporate records, and approximately 5,000 petty cash vouchers were similarly inspected and traced. Only a trained accountant could perform such labors.

In connection with the investigation of plaintiff, the assigned I.R.S. agents periodically met with staff members of the United States Attorney's office, informed them of developments in the investigation, and received direction, advice and counsel in the pursuit of the investigation. The I.R.S. agents assigned to the investigation of the plaintiff were instructed about and were aware of the secrecy requirements attendant to grand jury proceedings, although no oath of secrecy was administered to them. Notwithstanding plaintiff's allegations, there is no evidence that the I.R.S. employees violated the secrecy requirement pertaining to grand jury matters; records of plaintiff obtained pursuant to grand jury subpoena have been disclosed to no agency other than the I.R.S. And, as we have already found, I.R.S. has made no civil tax use of any records or information supplied pursuant to the grand jury.

It is true, as plaintiff contends: 1) that the records of plaintiff, after subpoena to the grand jury, were retained in the offices of I.R.S.; 2) that the Assistant United States Attorney in charge of the investigation did not directly supervise the subsidiary I.R.S. employees (as opposed to the supervisors or case agents with whom he worked); and 3) that he did not know the identity of all I.R.S. employees who had access to grand jury material. It is also true that at one point, following I.R.S. directions, special agent Pyfer (erroneously in our view) refused to consult with plaintiff's counsel who was representing him in connection with the grand jury proceedings before us, because counsel had filed no power of attorney with I.R.S. Although we will comment below as to ways in which 6(e) procedure can (and should) be improved, these facts highlighted by plaintiff do not inveigh against our ultimate finding that the terms of the various 6(e) orders were complied with and that the subpoenaed material remained under the aegis of attorneys for the government.

### 3. Retention of Records

The findings of fact set forth earlier demonstrate that a large number and variety of plaintiff's records for the years 1970–73 have been subpoenaed in connection with the grand jury investigation. We have no count on the precise number of records subpoenaed, although

plainly it runs into the tens of thousands. Plaintiff made no objection to the subpoenas when originally served and in due course delivered the records without objection. At the time of institution of the present proceedings, however, plaintiff objected to the retention of records. Indeed, our initial personal involvement in this case was at a conference at which the question of return of records was discussed. As the result of that conference, on December 13, 1971, the bulk of plaintiff's records were ultimately returned. However, a significant number of checks and invoices have not been returned.

Because the investigation has been proceeding for so long, we urged the government, at various conferences, to complete its examinations of the records as quickly as possible. The government of course pointed out that the vast number of the documents and the complexity of the accounting analysis (described above) explained the delay. We nonetheless required the government to file an *in camera* affidavit explaining the necessity for the retention of original documents (as opposed to our suggestion that it return all originals and retain xerox copies). The *in camera* affidavit, which is filed of record, essentially states that the grand jury needs to retain original documents in order to perform typewriter comparison analysis, deter-

mination of comparative ages of actual type print between original and carbon copies, handwriting analysis, and similar scientific investigatory tests, and to prevent the destruction of what may be needed as evidence at a trial. In Part III.D. below, we discuss the legal adequacy of these asserted grounds for retention of original documents.

### III. *Discussion*

#### A. *Introduction: The Powers of an Investigating Grand Jury; The Scope of Our Review*

 It is settled that the investigative powers of a grand jury are very broad. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); [26] *Blair v. United States*, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919); [27] *In re: Grand Jury Proceedings (United States Steel—Clairton Works)*, 525 F.2d 151 (3d Cir., 1975), at 156–57. See generally L. Clark, *The Grand Jury: The Use and Abuse of Political Power* (1975); Orfield, *The Federal Grand Jury*, 22 F.R.D. 343 (1959) (history of Fed.R.Crim.P. 6); Kaufman, *The Grand Jury—Its Role and Its Powers*, 17 F.R.D. 331 (1955); Note, *The Grand Jury: Power, Procedures and Problems*, 9 Colum.J.L. & Soc.Prog. 681 (1973). [28] Moreover, a presumption

---

**26.** In *Calandra*, Justice Powell stated:

The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement. A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person. The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged.

414 U.S. at 343, 94 S.Ct. at 617.

**27.** In *Blair*, the Supreme Court declared:

It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular in-

dividual will be found properly subject to an accusation of crime. As has been said before, the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning.

250 U.S. at 282, 39 S.Ct. at 471.

**28.** The scope and breadth of these powers has given rise to increasing criticism in recent years. *United States v. Lardieri*, 506 F.2d 319, 323–24 (3d Cir. 1974). *See, e. g.*, Grand Jury Reform Act of 1975, H.R. 2986, 94th Cong., 1st Sess. (intro. Feb. 6, 1975, by Rep. Conyers, at 121 Cong.Rec. E486–89 (daily ed.)); Antell, *The Modern Grand Jury: Benighted Supergovernment*, 51 A.B.A.J. 153 (1965); Schwartz, *Demythologizing the Historic Role of the Grand Jury*, 10 Am. Crim.L.Rev. 701 (1972); Boudin, *The Federal Grand Jury*, 61 Geo.L.J. 1 (1972);

of regularity attaches to grand jury proceedings. *In re Grand Jury Proceedings,* 486 F.2d 85, 92 (3d Cir. 1973) (hereinafter *Schofield I*). *Schofield I* and *Schofield II,* 507 F.2d 963 (3d Cir. 1975), attest to the breadth of a grand jury's investigative power. *Schofield I* required "some preliminary showing by affidavit that [subpoenaed matter] is at least relevant to an investigation being conducted by the grand jury and properly within its jurisdiction, and is not sought primarily for another purpose." 486 F.2d at 93. In *Schofield II* the court held that an affidavit supplying but "scant" information met with the *Schofield I* test, 507 F.2d at 967, and required the government to make only a minimal showing of the existence of a proper purpose for a grand jury subpoena before triggering the enforcement (contempt) machinery of the judicial branch.

■ The tripartite *Schofield I* test does, of course, place certain limitations upon the scope of the grand jury process. As such it is one of a long line of cases establishing the proposition that federal courts have jurisdiction to quash un-reasonable and oppressive federal grand jury subpoenas. *See, e. g., United States v. Calandra,* 414 U.S. 338, 346 n. 4, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Branzburg v. Hayes,* 408 U.S. 665, 708, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Hale v. Henkel,* 201 U.S. 43, 76–77, 26 S.Ct. 370, 50 L.Ed. 652 (1906); *Schwimmer v. United States,* 232 F.2d 855 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956); *In re Grand Jury Subpoenas Duces Tecum Addressed to Certain Executive Officers of M. G. Allen & Assoc., Inc.,* 391 F.Supp. 991 (D. R.I.1975). *See also* Fed.R.Crim.P. 17(c); *cf.* 28 U.S.C. § 1826(a) (enforcement). While the relief to be granted may take various forms, it is plain that the District Court's supervisory power over the grand jury is not limited to granting relief from unreasonable and oppressive grand jury process. Rather, it extends, as *Schofield I & II* indicate, to granting relief from any type of grand jury abuse.[29] However, as Judge Van Dusen noted in *United States v. Johns-Manville Corp.,* 213 F.Supp. 65, 72 (E.D.Pa.1962), after confirming the foregoing principle:

Fine, *Federal Grand Jury Investigation of Political Dissidents,* 7 Harv.Civ.Rts.—Civ. Lib.L.Rev. 432 (1972); Younger, *The Grand Jury Under Attack,* 46 J.Crim.L. 26, 214 (1955); Goodell, *Where Did the Grand Jury Go?,* Harper's Mag., May 1973; Cowan, *The New Grand Jury,* N.Y. Times Mag., April 29, 1973. *See generally* Nat'l Lawyers Guild, *Representation of Witnesses Before Federal Grand Juries: A Manual for Attorneys* (1974).

29. For example, a court may review grand jury abuses such as:

Prejudicial remarks and questioning: see *United States v. Whitted,* 325 F.Supp. 520 (D.Neb.1971); *United States v. DiGrazia,* 213 F.Supp. 232 (N.D.Ill.1963); but see *United States v. Bruzgo,* 373 F.2d 383 (3d Cir. 1967).

Prosecutorial domination: see *United States v. Daneals,* 370 F.Supp. 1289 (W.D. N.Y.1974); but see *Patriarca v. United States,* 402 F.2d 314, 323 (1st Cir. 1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); *United States v. Mitchell,* 397 F.Supp. 166, 172 (D.D.C.1974).

Inducement of perjury or contempt: *Bursey v. United States,* 466 F.2d 1059, 1079–81 (9th Cir. 1972).

Manipulation of situs: *Brown v. United States,* 245 F.2d 549 (8th Cir. 1957); but *cf. In re Tierney,* 465 F.2d 806 (5th Cir. 1972); *Hearing [re Grand Jury Venue—N.D. Tex.] Before Subcom. No. 1 of House Com. on Judiciary on H.Res. 220, etc.,* 93d Cong., 1st Sess., ser. 3, at 3–40 (March 13, 1973) (Sen. Kennedy).

Intimidation or harassment: see *Branzburg v. Hayes,* 408 U.S. 665, 707–08, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *United States v. Remington,* 191 F.2d 246 (2d Cir. 1951), *cert. denied,* 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325 (1952), *on retrial,* 208 F.2d 567 (1953), *cert. denied,* 347 U.S. 913, 74 S.Ct. 476, 98 L.Ed. 1069 (1954); *cf. In re Baldinger,* 356 F.Supp. 153 (C.D.Cal.1973).

Interference with attorney-client relationship: *In re Grand Jury Proceedings (Duffy),* 473 F.2d 840 (8th Cir. 1973); *In re Terkeltoub,* 256 F.Supp. 683 (S.D.N.Y.1966); but see *United States v. Colasurdo,* 453 F.2d 585, 595–96 (2d Cir. 1971).

Post-indictment attempts to gather evidence: *United States v. Fisher,* 455 F.2d 1101, 1104–05 (2d Cir. 1972); *In re Iaconi,* 120 F.Supp. 589 (D.Mass.1954); but see *United States v. Doe [Ellsberg],* 455 F.2d 1270 (1st Cir. 1972).

[I]t has been consistently stated that there should be no curtailment of the inquisitorial power of the grand jury except in the clearest case of abuse, and mere inconvenience not amounting to harassment does not justify judicial interference with the functions of the grand jury.

We accept Judge Van Dusen's formulation as an accurate synthesis of the law and frame the scope of our inquiry accordingly.

B. *Has the Government Abused the Grand Jury Process in Connection With the Hawthorne Investigation?*

The plaintiff has asserted a number of instances of alleged abuse of the grand jury process (*see* n.2, *supra)* in support of its claim that we should exercise our equitable power to halt this investigation. Our findings of fact negate these allegations of bad faith and abuse. However, those findings lack completeness and perspective without the legal discussion which follows.[30]

■ We first address plaintiff's objection to the subpoena of its records by several successive grand juries. That fact in and of itself does not require relief, for it is well settled that a successive grand jury has the power and authority to consider matters already considered by or submitted to a prior grand jury. *United States v. Thompson,* 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920). As the court in *United States v. Schack,* 165 F.Supp. 371, 375 (S.D.N.Y.1958), stated:

A subsequent grand jury has the undoubted power to inquire into and to indict upon a charge which has been previously considered by another grand jury and which has failed to return an indictment.

Even closer to the facts of the present case is *United States v. Culver,* 224 F. Supp. 419 (D.Md.1963). There, corporate records were produced by a corporate officer pursuant to a subpoena of the June, 1962 Term Grand Jury in the District of Maryland. The officer testified as to the identity of the records being produced, and thereafter the Assistant United States Attorney turned the records over to the postal inspector assigned to the mail fraud investigation. The examination of the subpoenaed records had not been completed prior to the expiration of the June, 1962 Grand Jury and the postal inspector did not testify or report to this grand jury concerning these records. Thereafter, the matter was presented to a successor grand jury, which returned an indictment. In discussing this matter in the context of an alleged abuse of the grand jury process, the court stated:

The fact that the grand jury for which the documents were originally subpoenaed was discharged after its normal three months term did not prevent a subsequent grand jury from considering the same subject and returning a true bill.

224 F.Supp. at 432.

From the foregoing authorities, it is clear the authority of one grand jury to continue an investigation into a matter previously investigated by another grand jury cannot be questioned. Since the materials subpoenaed from plaintiff were sought only in connection with valid, existing grand juries, the plaintiff's claim as to a non-existent or "expired" grand jury clearly has no factual or legal basis. Compare *United States v. Fein,* 504 F.2d 1170 (2d Cir. 1974).

Closely intertwined with plaintiff's complaint about the matter being submitted to successive grand juries is its contention that the grand jury process has been abused by reason of the sheer lapse of time since the jury's initial foray into the plaintiff's affairs by its duces tecum subpoena on August 15, 1973.[31] The lapse of time is in turn al-

---

30. Those claims of abuse which relate to violations of the 6(e) orders and of grand jury secrecy and those relating to the retention of records are discussed in succeeding sections of this opinion.

31. We can find no cases dealing with the point at the preindictment stage, perhaps because one remedy available to plaintiff if there is in fact abuse is to move to dismiss any indictment which may result from the investigation

leged to be a product of the government's bad faith. While the delay has not been inconsiderable, it has been, in significant part, the result of three factors which do not signal bad faith. First, there was transitional delay occasioned by the transfer of responsibility for the municipal contracts investigation from the Justice Department's Strike Force to the United States Attorney's office. Second, delay followed from plaintiff's own failure to turn over records when requested. Third, plaintiff's records were so voluminous that it has taken a significant amount of time to complete the comprehensive examination that the investigation requires.

■ Notwithstanding the foregoing, we believe that the government can move much more ·expeditiously to complete the investigation and strongly suggest that it do so. It is true that the secrecy surrounding the grand jury process will protect plaintiff from exposure in the event it is not indicted, but the annoyance and inconvenience accompanying the investigation are sufficient grounds to require that the government move expeditiously.

While we are on the subject of efficiency, we add our disenchantment with the record keeping procedures employed in connection with this investigation. Strange as it may seem, the most difficult phase of making and assembling our

findings of fact was the unravelling of the government's affidavits as to what was submitted to which grand jury and when. Obviously, the government had difficulty itself in assembling the facts, for it was only after a number of successive affidavits (at least one of which seemed to contradict an earlier affidavit—see n.24 *supra*) that the facts were all put before us. We are cognizant that the supervisory power of the grand jury reposes in the court, rather than a single judge. However, we take the liberty of suggesting to the United States Attorney that he create and maintain internally a formal grand jury docket or minute book, parsed as to discrete grand juries, investigations and targets thereof, and annotating returns of subpoenas, grand jury submissions, names of witnesses, etc. Such a volume would have manifold value, both as a housekeeping and monitoring device and as evidentiary material where required by order of the court.

■■ We now turn to plaintiff's remaining contentions about bad faith and abuse of the grand jury process. The general principles which we have set forth in Part III.A. demonstrate our power to accord relief from oppressive conduct of a grand jury investigation. We have found as a· fact that the government made no misrepresentations in order to· obtain plaintiff's records.[32] In

on due process grounds. See *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) ; *United States v. Benson*, 487 F.2d 978, 985–86 (3d Cir. 1973) ; *United States v. Feldman*, 425 F.2d 688 (3d Cir. 1970) ; *United States v. Rutkowski*, 337 F. Supp. 340, 342 (E.D.Pa.1971) (Lord, C.J.) ; *United States v. Harmon*, 379 F.Supp. 1349 (D.N.J.1974).

32. The alleged misrepresentations relate to whether, when its records were first supplied, the plaintiff was informed that it was a possible subject of investigation. In view of our finding, we need not discuss here whether plaintiff had any such right to notice of its status as "target," rather than as "mere witness," or whether assuming it did not, it had nonetheless a right not to be misled on that point. See *United States v. Mandujano*, 496

F.2d 1050 (5th Cir. 1974), cert. *granted*, 420 U.S. 989, 95 S.Ct. 1422, 43 L.Ed.2d 669 (1975) ; *United States v. DiMichele*, 375 F.2d 959 (3d Cir. 1967) ; *cf. United States v. Ortega (Ventola)*, 517 F.2d 1006, 1008–09 (3d Cir. 1975) ; *United States v. Lardieri*, 506 F.2d 319 (3d Cir. 1974). See generally *Panel and Discussion—. . . Ethical, Moral, and Legal Obligations of the Prosecutor in a Grand Jury Investigation . . .*, 67 F.R.D. 536, 540–44 (D.C.Cir.Judicial Conf. 1975) (remarks of S. Glanzer).· The contention is probably unavailing in any event since plaintiff is a corporation which possesses no Fifth Amendment rights. *Hale v. Henkel*, 201 U.S. 43, 69–76, 26 S.Ct. 370, 50 L.Ed. 652 (1906) ; see *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944) ; *Wilson v. United States*, 221 U.S. 361, 31 S.

view of plaintiff's allegations of bad faith we required the government to make a *Schofield* showing; it did so by in camera affidavit which demonstrates that the grand jury is making progress in its investigation and that there is indeed a basis for the existence and continuance of the investigation.

■ Another form of bad faith alleged lies in the failure of the government to submit the subpoenaed material promptly to the grand jury. But no bad faith inhered therein because of the manner in which a grand jury investigation actually functions; *i. e.*, it is only after the experts sift and review and collate and ponder vast amounts of subpoenaed material that a determination can be made as to what to submit to the grand jury. To simply deposit the material in the grand jury room for 23 lay persons to inspect would be unproductive if not chaotic, especially in complex tax and corruption investigations. *United States v. United States District Court*, 238 F.2d 713 (4th Cir. 1956), *cert. denied*, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957).

■ Still another contention as to bad faith and abuse is that the grand jury investigation was either a subterfuge for carrying on a previous I.R.S. investigation or a cover to obtain records for civil tax purposes.[33] Where the grand jury is used by the government as a cover to obtain records for a civil investigation, the grand jury process is subverted and relief must be granted. *In re April 1956 Term Grand Jury*, 239 F.2d 263 (7th Cir. 1956); *United States v. Doe*, 341 F.Supp. 1350 (S.D.N.Y. 1972); *Pflaumer, supra*, 53 F.R.D. at 473, 474; *cf. United States v. Ryan*, 455 F.2d 728, 731–33 (9th Cir. 1972); *Durbin v. United States*, 94 U.S.App.D.C. 415, 221 F.2d 520 (1954). However, we have found as a fact that there was no previous I.R.S. investigation, that the grand jury was not used as a cover to obtain records for civil purposes and that the sole purpose of the grand jury investigation was criminal in nature.

■ Plaintiff does not object to the "overbreadth" of the subpoenas as such.[34] However, to the extent that overbreadth might be evidence of bad

---

Ct. 538, 55 L.Ed. 771 (1911); *cf. Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974), *aff'g* 483 F.2d 961 (3d Cir. 1973).

While a corporation's representative witness may assert a *Fourth* Amendment objection to the *scope* of a grand jury subpoena, *Hale v. Henkel, supra*, 201 U.S. at 71–77, 26 S.Ct. 370, our finding that there was no misrepresentation also obviates any need to consider the impact such a misrepresentation might have had on our treatment of plaintiff's failure to move to quash the subpoenas on grounds of oppression or overbreadth. *See* text and note 34, *infra*.

33. One of plaintiff's hardest pressed contentions as to the bad faith relates to the issuance by Special Agent Pyfer of certain I.R.S. summonses during the pendency of the grand jury's criminal investigation. Use of an I.R.S. summons in aid of a criminal investigation is improper. *Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); *United States v. Fisher*, 500 F.2d 683, 686–87 (3d Cir. 1974), *cert. granted*, 420 U.S. 907, 95 S.Ct. 824, 42 L.Ed.2d 835 (1975). However, as our findings of fact establish, the sum-

monses were mistakenly issued, the government discovered its error soon after issuance of the summonses, and they were withdrawn before any information or documents had been produced in response.

34. See *Schwimmer v. United States*, 232 F.2d 866, 868 (8th Cir. 1956), where the plaintiff, the target of a grand jury investigation, raised Fourth but not Fifth Amendment issues on a motion to quash a subpoena under Fed.R.Crim. P. 17(c). When he later attempted to attack the subpoena on self-incrimination grounds in a collateral injunctive action, the court dismissed, holding in part that having first chosen the motion to quash as his vehicle for relief, he would be deemed to have waived arguments which could have been raised there but were not. In the instant case, where overbreadth is raised only as an example of bad faith (and necessarily so, because the documents have long since been turned over to the grand jury), it is not necessary to consider whether the plaintiff's complete failure to move to quash under Fed.R.Crim.P. 17(c) might be held to be a waiver of the point in this later injunctive action.

faith, we hold that the subpoenas were reasonable within the standards of *United States v. Gurule,* 437 F.2d 239 (10th Cir. 1970), *cert. denied,* 403 U.S. 904, 91 S.Ct. 2202, 29 L.Ed.2d 679 (1971), and that the quantity of records called for here was no greater than that called for and approved in *In re Corrado Bros., Inc.,* 367 F.Supp. 1126 (D.Del. 1973) and *In re Grand Jury Investigations (Local 542—Int'l Union of Operating Engineers),* 381 F.Supp. 1295 (E.D.Pa.1974). See also *Universal Mfg. Co. v. United States,* 508 F.2d 684 (8th Cir. 1975).

■ In sum, we have surveyed the record and find no evidence of bad faith or abuse of grand jury process.[35]

■ Plaintiff's final and broadest attack on the continuation of the investi- gation emerged only at our final hearing. Succinctly stated it is that the grand jury process has been abused because in actuality the grand jury is no longer the arm of the court or the historic shield between the government and the individual,[36] but rather the arm of the prosecutor, manipulated at his whim and subject to his complete control. Plaintiff's claim is somewhat overstated, for as our findings of fact show, the grand jurors themselves do play some role in the decision making process. Moreover, whatever may be said of the prosecutor's dominance, many basic grand jury safeguards remain. However, in broad general terms our findings of fact fairly and substantially support the claim that the grand jury is essentially controlled by the United States Attorney and is his prosecutorial tool.[37]

35. Neither is there merit to plaintiff's contention that no civil use may ever be made of the subpoenaed material. So long as the government did not act in bad faith, ultimate civil use is proper. (The government has certified that no such use has been made to date.) See *United States v. General Electric Co.,* 209 F. Supp. 197 (E.D.Pa.1962) ; *In re Petroleum Industry Investigation,* 152 F.Supp. 646 (E.D. Va.1957) ; *Pflaumer, supra,* 53 F.R.D. at 476.

36. *See* G. Edward, *The Grand Jury* 27 (1906) ; McClintock, *Indictment by a Grand Jury,* 26 Minn.L.Rev. 153, 156 (1941) ; Kuh, *The Grand Jury "Presentment": Foul Blow or Fair Play,* 55 Col.L.Rev. 1103, 1107–09 (1955) ; *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962) :
 Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution ; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.

37. One experienced practitioner has noted :
 Indeed, generally, it is the prosecutor and not the grand jury that provides the only potential 'protection that exists between a possible accused and the bringing of criminal charges. . . .
 In theory, the grand jury could function without the prosecutor's direction and control. . . . However, as a practical matter, in the federal context, it is the prosecutor who provides the initiative and im- petus needed for an effective grand jury investigation. He controls the commencement, pace, direction and scope of the investigation and serves the grand jury in the dual capacity of legal advisor. and chief full-time investigator. He decides what witnesses, evidence and information must be subpoenaed. He drafts the subpoenas and sets the date for each grand jury meeting. He conducts screening interviews with witnesses before they testify . . . . He places witnesses before the grand jury and normally conducts the initial examination. He will secure investigative support . . . . He will represent the grand jury in any legal proceedings ancillary to the investigation—for example, motions to quash subpoenas and contempt proceedings. He will obtain immunity grants and . . . will ultimately draft the indictment or information, if one is needed.
 *Panel and Discussion—* . . . *The Ethical, Moral, and Legal Obligations of the Prosecutor in a Grand Jury Investigation* . . . ., 67 F.R.D. 536, 538–39 (D.C.Cir. Judicial Conf.1975) (remarks of S. Glanzer). See *United States v. Dionisio,* 410 U.S. 1, 23, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (Douglas, J., dissenting) :
 It is, indeed, common knowledge that the grand jury, having been conceived as a bulwark between the citizen and the Government, is now a tool of the Executive. See also *United States v. Kleen Laundry & Cleaners, Inc.,* 381 F.Supp. 519, 520–23 (E. D.N.Y.1974) ; *Panel Discussion, supra,* 67 F. R.D. at 545–53 (remarks of Prof. C. Ruff) ; and sources cited at notes 28–29 *supra.*

As we have noted above (see n.28) plaintiff is not the first to make such allegations. Obviously, if the extent of prosecutorial control over the grand jury invalidates the investigation at issue, it must likewise invalidate every grand jury investigation presently under way in the land. Equally obviously, under the present state of the law we are not at liberty to so decree. Indeed, in *Schofield I* Judge Gibbons referred to "some fundamental propositions":

> First, although federal grand juries are called into existence by order of the district court, Fed.R.Crim.P. 6(a); 18 U.S.C. § 3331, they are 'basically . . . a law enforcement agency.' . . . They are for all practical purposes an investigative and prosecutorial arm of the executive branch of government. *See* 8 J. Moore, Federal Practice ¶ 6.02 [1], [6] (2d ed. Cipes ed. 1972).

486 F.2d at 89–90. No evidentiary or legal showing has been made in this case to support the plaintiff's broad claims. It would take far more than we have seen to conclude that the basic operation of American grand juries today violates the purposes of Rule 6 or the intent of the Framers of the Fifth Amendment.

C. *Has the Government Breached the Secrecy of the Grand Jury or Violated an Order Under Federal Criminal Rule 6(e)?*

On three occasions judges of this court have entered orders pursuant to Fed.R. Crim.P. 6(e) authorizing the Justice Department to utilize the assistance of agents, special agents, and employees of the I.R.S. in connection with the investigation under attack, and conferring upon these agents access to books, records, documents, and transcripts of testimony before the grand jury.[38] Each such order further provided that the I.R.S. personnel were not prohibited from utilizing the material in the course of their official duties, for either criminal or civil purposes, provided that the subpoenaed material shall remain at all times "under the aegis of attorneys for the government." The language of each of the orders was identical and was modeled after the order framed in *Pflaumer.* The manner in which the 6(e) orders were implemented has been explicated in our findings of fact.

Rule 6(e) in pertinent part provides:

> Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.[39]

---

38. In his memorandum in *In re Grand Jury Investigation, Edward F. Dixon,* Misc.No. 72–83 (E.D.Pa., Sept. 24, 1973), Judge Van Artsdalen expressed doubts that any Rule 6(e) order is required to authorize I.R.S. agents to examine books and records and transcripts of testimony presented before the grand jury in order to assist the United States Attorney in presenting matters before the grand jury. However, the practice in this District over the past four years has been that a 6(e) order is sought whenever the technical assistance of I.R.S. is requested by the Justice Department. We understand that I.R.S. has requested that the practice be followed, for its own protection. As will be seen, we believe that the practice is a good one.

39. The term "Attorney for the government" is defined in Fed.R.Crim.P. 54(c), which (in pertinent part) provides:

> As used in these rules . . . 'Attorney for the government' means the Attorney General, an authorized assistant of the Attorney General, a United States Attorney, [or] an authorized assistant of a United States Attorney . . . .

Disclosure of matters before the grand jury to attorneys for the government in aid of the grand jury's proper functions was accepted

In our opinion in the *Pflaumer* case, which turned on the first sentence of Rule 6(e), we dwelt at considerable length on the relationship between grand jury secrecy and the realities of the grand jury investigation process. More specifically, we directed our attention to the Justice Department's practice of utilizing personnel from agencies such as I.R.S. to provide the expertise which the Justice Department does not possess in connection with grand jury investigations of certain types of crimes. *Pflaumer* dealt, as does the present case, with the assistance of I.R.S. agents. After describing the interrelationship between I.R.S. and the Justice Department in such matters, we noted:

> While the government attorney who receives the assistance of those agents receives, in effect, the assistance of the entire agency, the effect of this relationship is that, despite the assignment to assist the United States Attorney in his work before the grand jury, these agents are still agents of the IRS. It is these factors, built into the grand jury investigative process, that Rule 6(e) does not come to grips with.

> In view of the foregoing [it seems questionable] to hold: (1) that agents of the IRS may use the documents and records to assist the United States Attorney with respect to criminal matters; and (2) that the records and documents may be used for any criminal or civil violations that appear (see *United States v. General Electric Co., supra*), but then to say: (3) that the documents and records, when they are being processed through the agency itself and are beyond the immediate

control of the United States Attorney lose their viability . . . ..

53 F.R.D. at 476 (footnote omitted). While suggesting that Rule 6(e) be re-evaluated and clarified by the Supreme Court Rules Committee, we refused the motion of Pflaumer, the party under investigation, for a protective order barring I.R.S. agents from access to the records, "so long as they remain under the aegis of attorneys for the government", *i. e.*, the United States Attorney's office and the Strike Force.

After we filed our opinion in *Pflaumer*, we submitted it to the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States. Others had also suggested clarification of Rule 6(e),[40] and in due course the Advisory Committee on Criminal Rules, in its January 31, 1973, Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure for the United States District Courts, recommended the following amendment to Rule 6(e):

> (e) SECRECY OF PROCEEDINGS AND DISCLOSURE. Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. *For purposes of this subdivision, "attorneys for the government" includes those enumerated in rule 54(c); it also includes such other government personnel as are necessary to assist the attorneys for the government in the performance of their duties.*

---

practice long before the promulgation of Rule 6(e). See *United States v. United States District Court*, 238 F.2d 713 (4th Cir. 1956), cert. denied, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957).

40. *See, e. g.*, 8 Moore's Federal Practice ¶ 6.05, at 6–56 (Waxner & Howarth ed. 1975):
The rule [6(e)] has presented a problem, however, with respect to attorneys from other agencies and nonattorneys who are assisting in preparation of a case for the grand jury or in preparing a case for trial after indictment. These assistants often cannot properly perform their work without having access to grand jury minutes. Conflicting decisions as to the propriety of such access indicate a need for clarification of the rule.

The Advisory Committee Note reads:

> The proposed definition of "attorneys for the government" is designed to facilitate an increasing need, on the part of government attorneys, to make use of outside expertise in complex litigation. The phrase "other government personnel" includes, but is not limited to, employees of administrative agencies and government departments.
>
> Present subdivision (e) provides for disclosure "to the attorneys for the government for use in the performance of their duties." This limitation is designed to further "the long established policy that maintains the secrecy of the grand jury in federal courts." *United States v. Procter and Gamble Co.*, 356 U.S. 677 [78 S.Ct. 983, 2 L.Ed. 2d 1077] (1958).
>
> . . . The limited nature of [the Rule 54(c)] definition is pointed out in *In re Grand Jury Proceedings*, 309 F.2d 440 (3d Cir. 1962) at 443:
>
>> The term "attorneys for the government" is restrictive in its application * * * If it had been intended that the attorneys for the administrative agencies were to have free access to matters occurring before a grand jury, the rule would have so provided.
>
> The proposed amendment reflects the fact that there is often government personnel assisting the Justice Department in grand jury proceedings. In *In re Grand Jury Investigation of William H. Pflaumer & Sons, Inc.*, [53 F.R.D. 464] (E.D.Pa.1971 . . .), the opinion quoted the United States Attorney:
>
>> It is absolutely necessary in grand jury investigations involving analysis of books and records, for the government attorneys to rely upon investigative personnel (from the government agencies) for assistance.
>
> See also 8 J. Moore, Federal Practice . . . . [note 40 *supra*]
>
> Although case law is limited, the trend seems to be in the direction of allowing disclosure to government personnel who assist attorneys for the government in situations where their expertise is required. This is subject to the qualifications that the matters disclosed be used only for the purposes of the grand jury investigation. The court may inquire as to the good faith of the assisting personnel, to ensure that access to material is not merely a subterfuge to gather evidence unattainable by means other than the grand jury. This approach was taken in *In re Grand Jury Investigation of William H. Pflaumer & Sons, Inc.*, . . . ; *In re April 1956 Term Grand Jury*, 239 F.2d 263 (7th Cir. 1956); *United States v. Anzelmo*, 319 F.Supp. 1106 (D.C.La.1970). Another case, *Application of Kelly*, 19 F.R.D. 269 (S.D.N.Y.1956), assumed, without deciding, that assistance given the attorney for the government by IRS and FBI agents was authorized.

■ The proposed amendment has not yet been acted upon by the full Rules Committee much less by the Conference and the Supreme Court. However, the principles announced in *Pflaumer* have been widely followed.[41] While the Third Circuit has never formally approved *Pflaumer*, it has affirmed by judgment order an opinion and order of Judge Vincent P. Biunno of the District of New Jersey expressly adopting the reasoning of *Pflaumer* and refusing to prohibit

41. See *In re February 1975 Grand Jury (Delphi Capital Corp., Movant)*, Misc. No. 75–192 (E.D.Pa., Aug. 11, 1975); *Shamy v. Goldstein*, No. 74–314 (D.N.J., May 1, 1974), *aff'd jmt. order*, 510 F.2d 970 (3d Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2630, 45 L.Ed.2d 672 (1975); *In re Kadish*, 377 F.Supp. 951 (N.D.Ill.1974); *In re Grand Juries Empaneled June 5, 1972 and August 13, 1973*, Misc. No. 47–73 (D.D.C., Nov. 12, 1973) (Sirica, C. J.); *In re July 1973 Grand Jury*, 374 F.Supp. 1334 (N.D.Ill.1973); *accord, In re Grand Jury 1974*, 377 F.Supp. 1282 (W.D.Okla.1974); *cf. In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to the House of Representatives*, 370 F.Supp. 1219 (D.D.C.1974).

access by I.R.S. agents assisting the United States Attorney to records subpoenaed before the grand jury. *Shamy v. Goldstein,* No. 74–314 (D.N.J., May 1, 1974), *aff'd jmt. order,* 510 F.2d 970 (3d Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2630, 45 L.Ed.2d 672 (1975).[42] Under the Internal Rules of the Third Circuit, ¶ D1(a), judgment orders lack precedential effect; hence, *Pflaumer* remains but another district court opinion. However, notwithstanding criticism of the *Pflaumer* opinion,[43] and subject to certain suggestions as to additional safeguards (see discussion *infra*), we remain of the view that its holding is sound. Therefore, we reject plaintiff's initial 6(e) claim; *i. e.,* that the granting of access to grand jury material to I.R.S. agents assisting the United States Attorney in the investigation itself violates the secrecy of the grand jury.

Proceeding from the premise that we were unlikely to recede from the position expounded at such length in *Pflaumer,* the plaintiff advanced a number of contentions to the effect that the 6(e) orders were violated by the government, as the result of which plaintiff submits that the investigation should be aborted or at least the I.R.S. prohibited from ever using for civil purposes the material to which it gained access. These allegations are: 1) I.R.S. employees were not sworn to secrecy or given adequate ad-

vice as to the I.R.S.'s limited access to grand jury material, *i. e.,* that it must remain under the aegis of the U. S. Attorney; 2) the plaintiff's records were, pursuant to direction or subpoenas, delivered directly to the offices of I.R.S. and not to the U. S. Attorney or the grand jury room; 3) I.R.S. retained the records in its possession; 4) the U. S. Attorney did not directly supervise the activities of the I.R.S. agents or know the names of all the I.R.S. agents working on the case; 5) the U. S. Attorney could have hired persons on a contract basis to assist it instead of utilizing I.R.S.; and 6) an I.R.S. agent working on the case refused to consult with plaintiff's counsel because he had not filed a power of attorney in accordance with I.R.S. regulations. In our findings of fact we have accepted the factual premise of each of these contentions with the exception of the second clause of (1) and' of ·(5). Our principal concern then is with the legal effect of this state of affairs.

We find it helpful at this juncture to consider views of the writer of the Note, *Administrative Agency Access to Grand Jury Materials,* 75 Col.L.Rev. 162 (1975).[44] The note discusses the trend, typified by recent cases such as *Pflaumer,* toward increasing administrative agency access to grand jury material. The author proceeds from a number of

---

**42.** Judge Biunno noted:

This Court is in agreement with the *Pflaumer* Court. Turning over documents subpoenaed by the Grand Jury to a Government agency that is "expert" in a field in order to facilitate the investigative function of the Grand Jury does not violate Rule 6(e), F.R.Crim.P. . . .

There can be no question of the right of the United States Attorney under Rule 6(e), F.R.Crim.P. to have materials analyzed by expert consultants whether in government service or private practice, so that he might be enabled to make a proper presentation for the Grand Jury's consideration.

Lawyers, whether employed by government or private clients, are constantly confronted with the problem of dealing with materials outside their expertise. For the lawyer to render his services properly, he must have

the assistance of experts, whether in the accounting or tax fields, or in engineering, fingerprint analysis, medicine or any other pertinent field. In private work, such disclosures do not violate or waive the attorney-client privilege and the matter disclosed remains privileged. So, here, it is the evident intent of the rule that the United States Attorney be enabled to perform his function properly, with such assistance as the needs of the particular case require.

**43.** *See* Note, *Administrative Agency Access to Grand Jury Material,* 75 Col.L.R. 162, 173 (1975), discussed at length *infra.*

**44.** The author is identified as James J. Sabella. Mr. Sabella and the editors of the Columbia Law Review are to be commended upon the excellence of the note.

fundamental premises including the following: 1) the powers of federal administrative agencies are tightly circumscribed by the statutes creating them; 2) federal agencies (including I.R.S.) are not permitted to launch general investigations which do not concentrate on a specific target;[45] 3) agency subpoenas are subjected to greater scrutiny than grand jury subpoenas;[46] 4) the agencies are not usually subject to the direct supervision of the courts; and 5) their activities, unlike those of the United States Attorney in connection with a given prosecution, are ongoing, so that vindication at trial does not serve as a meaningful protection in cases of abuse.[47] Against this background, the student writer believes that serious consequences flow from increased agency access to grand jury material:

> To the extent that access is gained to information unobtainable by the use of the agencies' own investigative procedures, the limits on agency power which Congress sought to build into the statutes are circumvented. Congress has chosen not to give the agencies powers comparable to those of the grand jury, but rather has fashioned statutes providing protections for citizens under administrative investigation. That policy is subverted when the agencies have easy access to kinds of information obtainable only by the grand jury's extraordinary powers.
>
> Aside from congressional policy, restrictions on agency investigations are fundamental to our liberties. The grand jury is properly an arm of the

court, not the executive. The agencies are denied unrestrained inquisitorial powers comparable to the grand jury's because that kind of power should not be vested in the executive branch. Expansion of agency power through indirect access to grand jury material permits the executive to wield such power.

75 Col.L.Rev. at 178–79 (footnotes omitted).

Under *Pflaumer* and the proposed amended Rule 6(e), the agencies have no independent right to material under the first sentence of Rule 6(e) governing disclosure to "attorneys for the government."[48] It was for this reason that, in *Pflaumer*, we limited their access to facilitating the rendering of technical assistance and imposed the "aegis of the United States Attorney" requirement, noting that:

> If there were no brakes upon the power of the government to set a grand jury upon an investigative course for the sole purpose of obtaining records to submit to a government agency for investigation, then our liberties would indeed be insecure, notwithstanding that the court can review the good faith questions as the Seventh Circuit did in *In re April 1956 Term Grand Jury, supra,* and as we will do in the next succeeding section of this Opinion.

53 F.R.D. at 476. The challenge that we perceive to be posed by the Columbia writer, succinctly stated, is whether the "aegis" requirement, which is contained in the 6(e) orders at issue before us, is

---

45. Relying on *Bisceglia v. United States,* 486 F.2d 706, 710–13 (6th Cir. 1973), *rev'd,* 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975) ; *United States v. Humble Oil & Ref. Co.,* 346 F.Supp. 944, 947 (S.D.Tex.1972), *aff'd,* 488 F.2d 953 (5th Cir. 1974), *vacated and remanded,* 421 U.S. 943, 95 S.Ct. 1670, 44 L.Ed.2d 97 (1975).

46. Compare *Local 174, Teamsters v. United States,* 240 F.2d 387, 390 (9th Cir. 1956), with *United States v. Dionisio,* 410 U.S. 1, 9, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) and *Schofield I and II, supra.*

47. The note writer concedes that, notwithstanding the Justice Department's powers under the first sentence of Rule 6(e) (sans technical assistance), there is not the same danger of abuse in Justice Department access as in agency access, because of the extent to which the Justice Department is subject to the supervision of the Court.

48. Nor do they have an independent right to access under the second sentence of Rule 6(e) governing discretionary disclosure by the court "preliminary to or in connection with a judicial proceeding."

sufficiently specific to prevent possible abuse. Upon reflection, we believe that a further explication of the "aegis" principle is in order.

 In addressing the matter of controls, there appear to be several areas of concern. First, there is the nature of the initial as well as continuing directions to the agency personnel as to the scope of their role. Second, there is the supervision of the agency personnel, and the insulation of their files and activities from general agency operations. Third, there is the matter of accurate record keeping. Fourth, there is the question of future use of the material. We perceive the first three of those matters to be properly before us

here.[49] Insuring that material to which an agency obtains indirect access through technical assistance supplied to the United States Attorney is not misused by it once free of the United States Attorney's aegis is a difficult problem, but must await future case development.[50]

 While we have found that the I.R.S. agents assigned to assist the Justice Department in the Hawthorne investigation were informed as to the limited nature of their access to the grand jury material, they were not sworn. We believe that they should be. The solemnity of the oath should be a useful prophylactic device, particularly where the oath takers are government

49. A point raised by the Columbia commentator relates to the threshold issue of whether a 6(e) order should be entered at all. He suggests that the Justice Department should be required to make a strict showing of necessity before any request for the interpretive assistance of the administrative agencies is granted. We agree, but are satisfied (see findings of fact, *supra*) that such a showing has been made here. The use of agency assistance in connection with tax matters which are highly technical in nature seems especially appropriate. The commentator suggests that the Justice Department might be required to employ a staff of technical experts or to retain expert nongovernmental personnel so as to decrease reliance on administrative agencies. The problems of duplication and financial drain posed by these solutions (and the problems of control over nongovernmental personnel) seem to us to outweigh the impact of indirect agency disclosure, against which safeguards can be imposed.

50. The Columbia Law Review note writer comments:

What subsequent use—as evidence, leads, or material for impeachment at administrative hearing—an agency may make of the grand jury information is equally unclear.

Even if the courts were to adhere closely to this "aegis of the United States Attorney" standard, several factors remain which render present controls inadequate. First is the extreme difficulty in demonstrating use and misuse of any particular material. Even if the agency were prevented from directly utilizing the grand jury information in its own investigations, that material might, nevertheless, provide leads to other information. The grand jury material could be used to clarify and interpret independent

information which might otherwise not indicate proscribed behavior. It might also serve to initiate an agency investigation which might otherwise never have ensued.

The grand jury process itself poses additional problems for courts investigating such abuses of the grand jury system. A person not indicted by the grand jury may not even be aware that information about him was presented to that body, and would consequently have no reason to suspect agency use of such material. In this context, the question of agency misuse of the grand jury may never be raised. . . .

In the unlikely event a court were to conclude that an administrative agency had used confidential grand jury material in its own investigation, it is unclear what remedial sanctions, if any, would be imposed. Although there is little case law on this issue, comparison with other instances of related misuse is instructive. In cases of unauthorized disclosure of grand jury material, even to agents of the FBI or IRS, courts have found dismissal of the indictment to be unjustified. Where the Department of Justice has used a grand jury for the sole purpose of obtaining evidence for use in a civil prosecution, the bulk of authority holds that the defendant's only remedy is equal access to the grand jury material. Although there are some indications to the contrary, it appears that the defendant cannot have the evidence suppressed.

75 Col.L.Rev. at 184–85 (footnotes omitted). This question was addressed on a narrow basis in *In re April 1956 Term Grand Jury, supra,* and in *Pflaumer* (by way of dicta), but the full range of questions involved have never been squarely faced in any discussion that we can find.

agents who understand its meaning. We further believe that comprehensive written instructions should be prepared for benefit of the I.R.S. employees, including supervisory personnel, who are assigned to provide technical assistance to the United States Attorney in connection with the investigation.[51] These instructions should make clear the limited nature of the I.R.S. access to the grand jury material. We cannot agree with plaintiff's contention that the secrecy of the grand jury is compromised because its records were delivered physically to the offices of I.R.S.[52] and retained, or that the United States attorney did not directly supervise the activities of the I.R.S. agents working on the case, or know their names.[53] However, we believe that it is important that the jury records be segregated from general I.R.S. files, secured and marked, and that the United States Attorney so certify to the court.

■ The question arises whether 6(e) orders should be applied for whenever technical agency assistance is to be utilized. If Rule 6(e) were amended as proposed in January 1973 (see text following note 40 supra), then Rule 6(e) orders might be unnecessary. Such orders, however, provide the occasion for adopting and enforcing the kinds of safeguards proposed here and in Pflaumer, and 6(e) orders should thus have continued value even under an amended rule.[54] We believe that 6(e)

orders should be applied for whenever the technical assistance of the I.R.S. or a similarly situated agency outside of the Justice Department (e. g., the S.E. C.) is to be utilized in connection with a grand jury investigation, with the exception of cases where the assistance is of minor proportions or the single instance variety (e. g., utilization of Postal Service or Secret Service expertise in obtaining and evaluating handwriting exemplars or other identification material). Moreover, we do not impart to "technical assistance" a meaning which would subsume routine investigation by an FBI agent, for example, in support of the grand jury investigation. The classical case for the application of 6(e) orders is the I.R.S. or S.E.C. case (or in some instances the Postal Service, Customs, or Secret Service case), where the agency has a continuing regulatory or oversight responsibility with respect to the activities of an individual or corporation, and the use and retention of grand jury material beyond the aegis of the U. S. Attorney would breach the secrecy of the grand jury and pervert the grand jury process, though an order should not, for reasons discussed above, be limited only to such cases.

Our reference in the preceding paragraph to "agencies outside the Justice Department" is a function of the fact: (1) that the U. S. Attorney is an officer of and subject to the control of the Court;[55] and (2) that the U. S. Attor-

51. We have examined the applicable provisions of I.R.S.'s Manual for Special Agents (§ 624 dealing with the grand jury) and find that its instructions as to grand jury secrecy are inadequate.

52. Especially where they are as voluminous as those at bar.

53. Neither do we find plaintiff's case buttressed by the fact that in one instance an, I.R.S. agent working on this case refused to consult with plaintiff's counsel because he had not filed a power of attorney in accordance with I.R.S. regulations. The agent was simply wrong to adhere to I.R.S. regulations where his function was to assist the United States Attorney. The I.R.S. may have a need to prevent disclosure of tax information

to unauthorized individuals that justifies its strict power-of-attorney regulations, but in this sort of case the attorney's authority can be instantly confirmed by a telephone call to the supervising Assistant U. S. Attorney or to the Clerk of the Court where an appearance has been filed.

54. In any case, we will forward a copy of this opinion (as we did with Pflaumer) to the Rules Committee for its consideration.

55. Cf. Richey v. Smith, 515 F.2d 1239 (5th Cir. 1975), discussing District Court supervisory jurisdiction over activities of government agents (such as I.R.S. officers) who are not, in traditional terms, officers of the Court.

ney has more control over agencies within the Justice Department (of which the U. S. Attorney General is the common head) than agencies outside.[56] There may also be cases where 6(e) orders should be applied for when the technical assistance is of some magnitude and is provided by agencies within the Justice Department. See, *e. g.*, *United States v. Universal Mfg. Co.*, 525 F.2d 808 (8th Cir. 1975);[57] *cf. In re Stolar*, 397 F.Supp. 520, 522–23 (S.D. N.Y.1975). In theory it may well be that a 6(e) order should be required for prophylactic purposes whenever any person or agency other than an "attorney for the government" has access to grand jury materials. However, the administrative burden on the U. S. Attorney, judges, and clerks of court would be enormous; hence, 6(e) applications should, it would seem, be reserved to cases where the technical assistance is of such substance and duration that, notwithstanding the good faith and aegis of the U. S. Attorney, the danger of breach of secrecy remains.

 In cases where 6(e) orders are issued, we also believe it to be in order for the United States Attorney to keep a Rule 6(e) docket, recording *inter alia* the following: 1) the general description of the investigation as set forth in the government's application for the 6 (e) order; 2) the identity of each investigative target; 3) the identity of all agency personnel with access to the material; 4) identity of the relevant agency supervisory personnel; 5) the identity of the Assistant United States Attorney(s) supervising the investigation; 6) the date on which each batch of grand jury material was received (generally identifying same); 7) the date on which the material was reached for consideration; and 8) the date on which the technical assistance was terminated. The 6(e) docket should also reflect the docket number and date of the 6(e) order governing the investigation, and the identity of the issuing judge.

 Finally, we believe it appropriate that when the agency has completed its technical assistance chores, a certification be filed by the United States Attorney to that effect. The certification should include a statement that all matters theretofore entrusted to the agency have been returned to the United States Attorney for appropriate disposition.[58]

Four questions at once arise from the foregoing. First, what is the source of our authority to impose these requirements? Second, what salutary effect will they have in the preservation of grand jury secrecy and the preservation of individual liberties? Third, having in mind that a ritual designed to preserve grand jury secrecy should not be the vehicle for its breach, which of these docket entries and certifications should be filed of record? Fourth, to what extent, if at all, do these requirements impede valid future use of grand jury materials to which the agency in question had indirect access? We address these questions seriatim.

 The source of our authority to impose the requirements with respect to the Hawthorne investigation is twofold: 1) the 6(e) order which we entered on June 6, 1974, pursuant to which the government is now operating; and 2) the

---

56. We are pleased to note, however, that the United States Attorney for this District has instituted an excellent set of grand jury procedures, which we have inspected *in camera*, designed to promote efficient handling and management of grand juries and their subpoenaed materials, including monitoring of all agency personnel operating under the United States Attorney's aegis on behalf of the grand jury. Some of these procedures should be helpful in preserving grand jury secrecy.

57. *United States v. Universal Mfg. Co.* was decided after our original opinion was filed in this case but prior to our amendment of the opinion pursuant to the government's motion for modification or clarification thereof.

58. *See* Part III.D. *infra.*

case before us which squarely raises the issue. We have noted above that supervisory power over the grand jury reposes in the entire court and not in a single judge. Whether or not it is desirable for this court to enact Rules vesting supervision over a given jury or for a given term in a particular judge (in rotation or otherwise), it has not done so.[59] It may be, of course, that for the reasons stated in the next paragraph of this opinion, the United States Attorney will voluntarily adopt generally the procedures which we will require in connection with the Hawthorne investigation, and we suggest that he do so. If, however, he prefers not to do so, we are powerless to do any more than to impose them in the case at bar, though we shall circulate this opinion to our brethren in this court with a memorandum calling their attention to our suggestions in the event they wish to take court action.

We believe that the potential salutary effects of our requirements are manifold. The oath and the two certifications required should go a long way to highlight and bright line the distinction between grand jury records to which I.R.S. has limited access for technical assistance purposes only and the remainder of the Service's records and activities. These devices should help insure that the records will not be utilized by the agency in any independent sense; concomitantly, they underscore and infuse meaning into the "aegis" concept. The 6(e) docket serves several ends. First, it should be an excellent housekeeping device.[60] As such it should en-able the United States Attorney to keep better track of proceedings and at the same time, by constantly impressing on the agency the nature of its limited access to the material, heighten the significance of the "aegis" concept. This in turn should help guard against abuse of the grand jury process, hence, help protect civil liberties. The inconvenience to the agency and the Justice Department of compliance would seem outweighed by the prophylactic effects of these requirements.

 More difficult is the determination of whether the 6(e) docket should in its entirety be a public record. Plainly, the skeletal aspects thereof should be: the identity of the judge issuing the order, its date and docket number, and the general description of the investigation as set forth in the government's application for the 6(e) order; the identity of the agency personnel, including supervisory personnel, with access to the grand jury material;[61] the name of the Assistant United States Attorney supervising the investigation; and the date on which the technical assistance was terminated. We also believe that the initial and final certifications (as to segregation of the grand jury material in the agency offices, etc.) should be filed of record, and we will so order with respect to the Hawthorne investigation. We believe that the remaining facets of the docket should remain within the confines of the United States Attorney's office (perhaps in the custody of a "grand jury clerk"), lest the secrecy of the grand jury be com-

---

59. Under this court's procedures, disputes arising out of matters before grand juries are assigned to the several judges of this court under the random assignment plan of Local Rule 3(c).

60. It is our impression (drawing inference from our own experience over the past four and one-half years) that 6(e) orders are not an infrequent occurrence in this court. There appears to be no central record of 6(e) orders in this court, hence, incertitude as to what 6(e) order applies to what investigation. The problem is compounded by the practice (see Findings of Fact and Discussion, *supra*) of submitting different aspects of different investigations to simultaneous grand juries and then to succeeding grand juries, the latter sometimes without the benefit of new 6(e) orders.

61. In *In re February 1975 Grand Jury (Delphi Capital Corp., Movant)*, Misc. No. 75–192 (E.D.Pa., Aug. 11, 1975), Judge Higginbotham ordered that the government disclose the identity of the S.E.C. employees granted technical assistance access by virtue of the 6(e) order. We follow Judge Higginbotham's decree.

promised by a public blow by blow description of its activities. Matters remaining within the United States Attorney's file will include the identity of a particular investigative target not disclosed by the initial 6(e) order and the date on which particular grand jury material was received and later reached for consideration. The entire 6(e) docket would, however, be available for inspection by court order.

We have contrasted the notion of the broad outlines of a given investigation with that of a given investigative target. All of the 6(e) orders involved in this case related to the general investigative subject of Philadelphia municipal contracts. Within this general description many investigative targets have been subsumed. Indeed, we have ourselves over the past several years acted upon requests for protective orders by several subjects of investigation with respect to whom the grand jury has apparently found nothing. The reputations of these parties might be compromised were their names to appear on a public docket. On the other hand, any party whose records or person is subpoenaed before a grand jury would have the public 6(e) docket as a general frame of reference, to make an informal judgment as to whether his records might have been subject to indirect agency access. Should it become necessary, in subsequent criminal or civil proceedings, such party could always apply to the court to have the entire 6(e) docket opened, though we presume that a strong showing would have to be made to justify opening the internal docket, even *in camera*.

Finally, we address the question whether the foregoing requirements impede future use of grand jury materials to which the agency in question had indirect (technical assistance) access. The

answer, plainly, is not at all. Once the agency releases its files and information to the grand jury its role is terminated, as it should be. The future use of the materials to which it had access will follow as though there had been no access.[62]

In conclusion, then, we believe there is no evidence in this record that the secrecy of the grand jury has been breached in this case. However, we shall modify our extant 6(e) order to add the requirements described so as to insure against future problems in connection with the Hawthorne investigation.

D. *Has the Government Improperly Retained Certain Original Documents Subpoenaed by the Grand Jury?*

Last, we turn to the point which originally formed the heart of the plaintiff's case: retention by the grand jury and its executive agents of some of the plaintiff's original business records. As we recounted in detail above, the grand jury issued four different subpoenae duces tecum to the plaintiff in August 1973, and May, July and August, 1974. In response to the first and second subpoenas the plaintiff produced some of the records sought; none were produced pursuant to the third; and finally, on September 4, 1974, in response to the fourth subpoena, the plaintiff turned over all the records requested. Three months later, when the government returned Hawthorne's materials, it retained several hundred of the originals[63] and in those cases returned photostatic copies.

The plaintiff contends that papers submitted in response to subpoena remain its property and that it is therefore entitled to continued possession of the records. The plaintiff contrasts this situation to the aftermath of a seizure pursuant to lawful warrant, where possession of the evidence or contraband seized

**62.** Obviously, the materials may result in an indictment. They may also result in use by the attorneys for the government (*e. g.*, the Justice Department itself, sans technical assistance), under the first sentence of Rule 6(e) or they may result in a petition for disclosure under the second sentence of Rule

6(e) permitting disclosure upon order of court preliminary to or in connection with a judicial proceeding.

**63.** As best can be deduced from the affidavit of Mary Gaskill, submitted on behalf of the plaintiff, December 30, 1974.

transfers to the government. This argument is intertwined with its arguments, which we have rejected above, that I.R.S. agents have had excessive access to the records and that the materials have not been properly presented to the grand jurors themselves. The logical extension of the plaintiff's position, once thought to be the law, is that a grand jury witness can comply fully with a subpoena duces tecum by merely appearing with the requested records in the grand jury room at the appointed hour and taking the papers away again at the end of the session. See *In re American Sugar Refining Co.*, 178 F. 109 (C.C.S. D.N.Y.1910), *app. voluntarily dismissed without consideration of the Court*, 223 U.S. 743, 32 S.Ct. 532, 56 L.Ed. 639 (1911).

The government responds to plaintiff's final contention with an affidavit of Assistant U. S. Attorney John Penrose, which says that retention of original records:

> is necessary to comply with expected requirements of the rules of evidence and/or because only such original records can be the subject of various scientific tests which are indicated as plausible possibilities to uncover further violations of federal law.[64]

The government argues that a grand jury is entitled to "temporary use" of subpoenaed original documents for such important and necessary purposes whenever a standard subpoena duces tecum issues, quoting *Hale v. Henkel*, 201 U.S. 43, 80, 26 S.Ct. 370, 50 L.Ed. 652 (1906) (McKenna, J., concurring).

 The case law on this subject is sparse indeed; both parties here agree with the result of our own researches that there are no reported cases on point,

and not many more that are even relevant. After considering these few decisions in the light of *Pflaumer, supra* (53 F.R.D. 464), and our prior discussion in this case, we conclude that neither the government nor the plaintiff has correctly stated the law. We hold that the grand jury and its executive agents (the United States Attorney's office and the I.R.S. agents subject to a valid 6(e) order) may retain the plaintiff's original documents while they are performing their lawful criminal investigatory functions, so long as the plaintiff's legitimate business need for the documents is at all times accommodated in some reasonable way.[65] When the legitimate, good faith, criminal investigatory use of the documents has ended, however, or when the grand jury is discharged without the investigation's having been resubmitted or scheduled for resubmission to a new grand jury, then all the original subpoenaed materials must be returned immediately to their owner, the plaintiff. Subpoenaed documents may only be retained after this time, for whatever purpose, on the authority of a judicial order of impoundment, duly applied for by the government.

In *Pflaumer* we reaffirmed the long-assumed principle that a grand jury was entitled to the expert aid of I.R.S. agents in analyzing the evidence in criminal tax cases. *Pflaumer* assumed, although it did not expressly decide, that such assistance need not be given in the grand jury room itself or in the presence of the grand jurors. As Judge Weinstein has recently declared: "It is settled procedure for the [executive branch of the] government to analyze evidentiary data for the purpose of reporting back to the grand jury." *United States v. Kleen Laundry & Cleaners, Inc.*, 381 F.Supp.

---

64. These tests apparently include fingerprinting, dating, and handwriting and typewriter comparison. Mr. Penrose may be implying that the government fears destruction or alteration of original records that may now be returned but later subpoenaed as evidence, and that it suspects that some subpoenaed records may already have been altered or falsified.

To date, we have not found that such fears are justified.

65. This accommodation can be achieved, for example, by permitting access to the originals from time to time, or by returning a full set of copies.

519, 523 (E.D.N.Y.1974) (*see also* cases cited). Indeed, Judge Weinfeld concluded long ago that:

> It would involve an unnecessary and unwarranted waste of time were the grand jury required to sit in session while accountants engaged to assist it examined each item—separating the wheat from the chaff and isolating matters which bear on the subject matter of the Grand Jury investigation.

*In re Kelly,* 19 F.R.D. 269, 269–70 (S.D. N.Y.1956).

 It would thus be anomolous, as well as counterproductive in terms of the realities of the grand jury investigative process, to hold here that the government could not retain the documents for some period of time after the witness subpoenaed has completed the *pro forma* duty of identifying them. We therefore conclude that the grand jury or the Assistant United States Attorney acting in good faith on the jury's behalf may require a witness to leave subpoenaed documents behind for examination and analysis, and the witness does not necessarily discharge his duty under the subpoena by bringing designated documents to the grand jury room in the morning and taking them "home" each afternoon.[66] Accord, *United States v. Culver,* 224 F.Supp. 419, 430–47 (D.Md.1963). However, we do find merit in the careful attention of the court in *United States v. Birrell,* 242 F.Supp. 191 (S.D.N.Y.1965), to the language used in standard grand jury subpoenae duces tecum, including those involved in this case:

> The command is that [the witness] appear before this Court on [a certain day] and bring with him the records 'then and there to testify'. Most distinctly the subpoena does *not* command that [the witness] 'deliver custody of all the property, here in question, to the jurisdiction of the . . . Court [. . .']

242 F.Supp. at 204.[67] And while we disagree with *Birrell's* suggestion that the terms of the standard subpoena do not *permit* retention of the records for examination, we think that the United States Attorney would do well to consider adding a couple of sentences in cases where retention of original records or copies may be necessary or useful, making clear to the witness that this approach is contemplated. Such explicit notice to the witness might prevent confusion and unnecessary litigation and would also afford witnesses a fairer opportunity to move under Fed.R.Crim.P. 17(c) in opposition to the government's actual intended use of the records.

 The plaintiff is correct in its contention that subpoenaed documents do not thereby become the property of

---

66. Obviously, we do not agree with the dictum originating with *In re American Sugar Refining Co., supra,* 178 F. at 111, and repeated in *United States v. Birrell,* 242 F.Supp. 191 (S.D.N.Y.1965), to the effect that one:
> could comply with the subpoena by attending with the records during the hours of court and keeping his records with him at all other times.

242 F.Supp. at 204. While daily delivery was ordered in *Kelly,* Judge Weinfeld made it clear that that system was devised *ad hoc* without objection from the parties to suit the particular circumstances of that case, and not because it was uniformly required by any right of the witness. 19 F.R.D. at 270.

67. In *Birrell,* the attorney for a trustee in bankruptcy caused a Bankruptcy Referee in the Central District of California to issue a purported "impoundment order" for certain documents. In addition, the attorney swore out an affidavit of criminal activity in support of a search warrant for the same papers in the Eastern District of Pennsylvania, and in aid of ancillary bankruptcy proceedings caused a subpoena duces tecum to issue for them out of the Southern District of New York. A six-member "party," armed with all three orders, seized the papers, and they were ultimately delivered to the Clerk of the Southern District. 242 F.Supp. at 197. In due course, an indictment for securities fraud and other crimes was handed down and the defendants moved to suppress evidence and for return of the papers. The court discussed the characteristics and qualities of impoundment orders and subpoenas and held that a physical seizure of documents could not have been supported by either. 242 F.Supp. at 202–05. Because the search warrant affidavits were patently insufficient, the evidence was suppressed.

the government or of the court. See, e. g., *In re Kelly,* 19 F.R.D. 269 (S.D. N.Y.1956). Thus, the government clearly has the ultimate "obligation to return the originals of the books and papers" subpoenaed. *In re Petroleum Industry Investigation,* 152 F.Supp. 646 (E.D.Va. 1957).[68] The real question, then, is how long the government may continue its custody of subpoenaed papers. We think the correct balance was well stated in an opinion denying quashal of a subpoena duces tecum, *In re Investigation Conducted by the Attorney General (Cudahy Packing Co.),* 27 F.Supp. 997, 998 (S.D.N.Y.1939):

> The production of the records called for [in a subpoena duces tecum] still subjects their use to the supervision of the court and appropriate provision may be made . . . to enable their production in such manner as will occasion the least possible inconvenience and annoyance to the petitioner, and for their prompt use and expeditious return.

In *United States v. Culver, supra,* 224 F.Supp. at 430–37, Chief Judge Thomsen held that a corporate president had authority voluntarily to allow the government to inspect documents that had been subpoenaed and then returned, especially since the "United States Attorney might have retained possession of the records . . . in order to complete the examination he was causing to be made for the grand jury, which had not yet been dismissed." 224 F.Supp. at 434. In other words, the government's right to retention of subpoenaed documents is coextensive with the time fairly required for completion of such analysis of the documents as justified the subpoena. During this period, the owner's possessory rights must also be respected. If the government does not allow the witness to remove the documents daily, then it must permit the owner to inspect and use them by some mutually convenient arrangement or else provide copies. In any case, the documents must be returned when the authority of the subpoena runs out; that is, when the examination of them ends, or when the grand jury expires without the investigation's being scheduled for a new grand jury, whichever comes first. We have previously said that we will require the United States Attorney's office to file a certificate when I.R.S. use of the plaintiff's papers under the 6(e) order has been completed. That certificate should also state that the papers have therefore been returned to the plaintiff or establish the necessity for their continued retention by the United States Attorney's office for the investigatory use that justified the original subpoena.

 There has been no serious allegation on this record (and no finding of fact) that plaintiff is likely to destroy or alter the original records if they are returned. In any case, the subpoenae duces tecum and accompanying 6(e) orders cannot support a retention of plaintiff's papers on that basis. As we have held, they only authorize "temporary use" of the documents for investigation. That is not to say, however, that the United States Attorney's office is powerless to prevent the pretrial destruction of evidence. The proper device for this purpose is application for a judicial order of impoundment, taking the papers into the custody of the court:

> Documents, records or papers produced in obedience to a subpoena duces tecum remain the property exclusively of the person who produces them and they must be returned to him as soon as proper use and examination of them for the purpose for which they were summoned has been completed. . .

> [Thus,] petitioner here was entitled to the return of all its papers as soon

---

68. *Cf. Schofield I,* 486 F.2d at 93–94:
 [An] order [enforcing a subpoena for handwriting exemplars and fingerprints] may properly, on the witness' request provide that if these materials do not prove to be relevant to the grand jury's inquiry, or to a resulting indictment, they be returned to the witness or destroyed.

as the Grand Jury was dismissed without having returned an indictment in 1942. Neither the Grand Jury nor the Department of Justice· has the authority to impound papers which it is deemed in the public interest to preserve. [citation omitted] That such power exists only in the court is clear. [citations omitted] It is equally clear that the application to impound should be made to the court before which the proceeding in which the papers are to be used is pending, so that they may be made available, in the court's discretion, to both sides.

*In re Bendix Aviation Corp.*, 58 F.Supp. 953, 954 (S.D.N.Y.1945). Honorable Gunnar H. Nordbye, who entered on duty as a United States District Judge in 1932 and who thus should know, has said: "Impounding orders in connection with Grand Jury investigations are frequently used." *United States v. Morton Salt Co.*, 216 F.Supp. 250, 257 (D.Minn. 1962), *aff'd*, 382 U.S. 44, 86 S.Ct. 181, 15 L.Ed.2d 36 (1965).[69] In the absence of a court order granting impoundment, the subpoenaed material must therefore be· returned.[70]

▆ When proper use of the subpoenaed material in this case, as defined in the preceding discussion, has ended, (and been memorialized in the 6(e) certificate) we will order the return of all the plaintiff's documents to it by government, unless the Department of Justice makes prompt application for an order impounding the papers which are

the subject of this proceeding. See *Bendix Aviation, supra*, 58 F.Supp. at 954. However, since the papers are still being examined for or by the grand jury, this issue does not yet arise, and because we have found no impropriety in the retention by the government of the plaintiff's original records, we deny relief on that asserted ground.

In accordance with the foregoing opinion, an order granting judgment for the defendants follows. In addition, pursuant to our supervisory power, we will file this day, under Misc. No. 74–138, an amended Rule 6(e) order governing the grand jury investigation of the plaintiff.

IN RE:

GRAND JURY INVESTIGATION

Misc. No. 74–138.

## AMENDED ORDER

And now, this 11th day of November, 1975, in consideration of the opinion and order filed this·day in *Robert Hawthorne, Inc., v. Director of Internal Revenue*, Civil Action No. 74–2874, it is ordered that the order entered June 6, 1974, under the above Miscellaneous Number, permitting disclosure of matters occurring before the grand jury by attorneys for the government to employees of the Internal Revenue Service is AMENDED by adding four further paragraphs thereto, as follows:

Each employee of the Internal Revenue Service utilized by attorneys for the

---

**69.** In *Morton Salt*, Judge Nordbye refused a postverdict motion for the return of over 100,000 documents subpoenaed before a grand jury and then impounded for use as evidence. Although Morton had been found not guilty of crime, the court permitted the impoundment to continue while the Antitrust Division conducted a civil investigation requiring inspection of those documents.

In *United States v. General Electric Co.* (*Motion of I–T–E Circuit Breaker Co.*), 211 F.Supp. 641 (E.D.Pa.1962), on the other hand, Circuit Judge Ganey, sitting specially as a district judge, ordered the impounded original records of a defendant which had been found guilty returned (more than a year after the verdict), while permitting the gov-

ernment to keep copies for civil investigatory purposes.

**70.** Ordinarily, impoundment need not encompass sealing of the material. Absent extraordinary circumstances, the owner of impounded material is fully entitled to its use under the supervision of the court:

Obviously the rights of each [party] will be fully protected if the papers are impounded in the Clerk's Office and each party allowed access thereto. . . . [E]ither party may examine [the impounded documents] in the presence of a Deputy Clerk or other representative of the [court]. *United States v. B. Goedde & Co.*, 40 F.Supp. 523, 534 (E.D.Ill.1941).

government as permitted by this order shall be sworn to uphold the secrecy of any grand jury matters that may come to his or her attention during the course of this investigation. The United States Attorney shall provide comprehensive written instructions to all such employees, making clear the limited nature of I.R.S. access to grand jury material. Any grand jury materials delivered at any time to the physical custody of the I.R.S. or any of its employees shall be segregated from general I.R.S. files, secured and marked, and the United States Attorney shall so certify to the court.

In connection with the investigation of Robert Hawthorne, Inc., by this or any successor grand jury, the United States Attorney shall keep a "Rule 6(e) Docket," recording *inter alia* the following: (1) the docket number and date of the 6(e) order governing the investigation, and the identity of the judge issuing it; (2) the general description of the investigation as set forth in the government's application for the 6(e) order; (3) the identity of each investigative target; (4) the identity of all agency personnel with access to the material; (5) the identity of the relevant agency supervisory personnel; (6) the identity of the Assistant United States Attorney(s) supervising the investigation; (7) the date on which each batch of grand jury material was received (generally identifying same); (8) the date on which the material was reached for consideration; and (9) the date on which the technical assistance was terminated.

When the agency has completed its technical assistance chores, the United States Attorney shall so certify to the court. The certification shall include a statement that all matters theretofore entrusted to the agency have been returned to the United States Attorney for appropriate disposition. Such disposition shall include return of all original papers, records, documents and the like to their respective owners, unless such papers, etc., have been made the subject of a judicial order of impound-ment or unless application for such an order is made simultaneously with the filing of the certification.

The United States Attorney's office shall maintain as a public record an abbreviated "6(e) Docket," containing items (1), (2), (4), (5), (6), and (9) above. The United States Attorney's office shall file of record the certificate of segregation of materials and the certificate of termination of agency assistance, as required above, when these certifications are made to the court.